WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. AMERI-
CAN STORES CO.
Nos. 8048, 8049.

Circuit Court of Appeals, Third Circuit.
Argued Dec. 7, 1942.
Decided Feb. 11, 1943.

Herman Marx, Irving J. Levy, Acting Sol., and Mortimer B. Wolf, Assistant Sol., all of Washington, D. C., Ernest N. Votaw, Regional Atty., of Philadelphia, Pa., and Edward Jay Fruchtman and Irwin S. Mason, Attys., United States Department of Labor, both of Washington, D. C., for Wage and Hour Division.

Joseph Gilfillan, of Philadelphia, Pa., for American Stores Co.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

The Administrator of the Wage and Hour Division, United States Department of Labor, brought this action in the District Court to restrain the defendant, American Stores Company, from violating §§ 15(a) (1), 15(a) (2) and 15(a) (5)[1] of the Fair Labor Standards Act of 1938. 52 Stat. 1060 (1938), 29 U.S.C.A. § 201 et seq. There was little or no dispute concerning the facts. Nor was there any doubt about the defendant's violation of the Act if, as a matter of law, it is subject to it. The court below after making extensive findings of fact, concluded that the company was subject to the Act and issued an injunction as prayed for by the Administrator except for the exclusion of certain employees. American Stores appeals from the decision holding it subject to the Act; the Administrator appeals from the ruling by which certain employees were excluded. The problem raised by the appeal of the American Stores will be discussed first.

I. Is the American Stores Company exempt under § 13(a) (2) of the Act?

Section 13 of the Act is the exemption section of which only the first two[2] classifications are relevant here. American Stores depends upon the second of these classifications which grants exemption according to the nature of the business of the establishment in which the employee is engaged, rather than the particular activities of the employee. The contention is clear and bold. The employer claims exemption because it says its entire enterprise is a retail establishment. If it is a retail establishment there seems to be no dispute that the greater part of its selling is in intrastate commerce. The Administrator does not contend that the employees whose duties consist of selling food products in defendant's retail stores come within the Act. Nor is it claimed that certain employees of the company-owned bakeries from which products are sold in the state of manufacture are within the Act. Except for the latter, the dispute concerns those employees of American Stores not employed in its retail stores. The question is whether the sum total of the activity of the American Stores Company constitutes a "retail establishment" so as to exempt the entire enterprise from the mandate of the statute.

The findings of fact made by the trial court give a comprehensive description of the business, organization and operation of the American Stores Company. Those necessary to the understanding of the question involved may be briefly stated.

The company is a Delaware corporation with its central office in Philadelphia. It operates eleven warehouses in five states and the District of Columbia, seven baker-

[1] Section 15(a) (1) makes it unlawful for any person to ship in commerce goods in the production of which any employee was employed in violation of §§ 6 and 7 of the Act, providing for minimum wages and maximum hours, or in violation of any regulation or order of the Administrator issued under § 14, providing for the employment of learners, apprentices, and handicapped workers. Section 15(a) (2) makes it unlawful for any person to violate §§ 6 and 7 or any of the provisions of any regulation or order of the Administrator issued under § 14. Section 15(a) (5) makes it unlawful for any person to violate § 11(c), providing for the making, keeping and preserving of certain records pertaining to wages, hours, and other conditions and practices of employment, making required reports, or to knowingly make or report any false statement pursuant to the provisions of that section.

[2] "Sec. 13 [§ 213]. (a) The provisions of sections 6 and 7 [sections 206 and 207 of this title] shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *".

ies in three states, two canneries in Maryland, purchasing offices at New York City and Philadelphia, a coffee roasting plant, an automobile maintenance plant, a mechanical shop, a laundry and garment shop, a printing and multigraphing shop, a laboratory, and a bottling works, a large food processing and manufacturing plant, all of the latter being in Philadelphia. It also operates approximately 2300 retail stores in Pennsylvania, New Jersey, Delaware, New York, Maryland and the District of Columbia. Defendant's subsidiaries, American Stores Company, Inc., a Virginia corporation, and American Stores Company, a West Virginia corporation, operate retail stores in Virginia and West Virginia, respectively. Defendant is also the parent of eleven other corporations, some of which are now inactive.

The financial volume of the transactions in which the defendant is engaged is large. In 1939 the sales of defendant's retail stores, directly owned, totaled $77,014,-652.23. Its assets were $32,662,976.91. The value of the merchandise received by the defendant's warehouses in 1939 exceeded $75,000,000. A similar amount was shipped. Its bakeries manufactured in excess of $3,250,000 worth of breads, cakes and pies. Almost $2,000,000 worth of coffee was distributed in 1939 from its coffee roasting plant. Defendant's warehouse in Philadelphia contains a manufacturing, processing and packing plant at which salad dressings, jams, delicatessen items, gelatine, tapioca, teas and spices and various other grocery items, bacon, beef and other meats are prepared and packed, and soft drinks are bottled. The value of these products for 1939 totaled more than $8,000,000. Its two canneries produced goods in that year in excess of $675,000.

The defendant's warehouses, with the exception of one which is a coffee roasting plant, receive and stock the products manufactured and processed by itself, numerous private label items produced and packed expressly for defendant, and hundreds of other items of other manufacturers. Each warehouse serves the retail stores in its zone, the operational territory of the defendant being divided into several zones.

Each warehouse carries various food products which it distributes upon order to defendant's retail stores and those owned and operated by its subsidiaries.[3] Each warehouse has its own storage, transportation and office facilities.

The retail stores are operated under a common general management. They vary, however, as to size, type of goods sold, service rendered and prices charged. Some stores sell dry groceries almost exclusively; others have groceries and a produce department; still others also have meat departments. Some operate on a self service plan. Some carry produce especially suited for the neighborhood in which they are located. The manager of each store bears the principal responsibility in ordering for his store. He also exercises discretion in setting certain prices. Hiring and discharging of store employees, and transfers of personnel rest solely with the defendant in all stores. The retail stores served by different warehouses are charged different prices for the same goods at the same time.[4] Separate accounting records are kept for each store which bears its own expenses of operation.

In the operation of its warehouses, offices, canneries, bakeries, coffee roasting plant, food manufacturing and processing plants, printing and multigraphing shop, auto maintenance and fixture plant, mechanical shop, and other non-retail selling units, the defendant employs approximately 3200 workers.

It is this great enterprise for which the defendant claims exemption from the Fair Labor Standards Act as a retail establishment. It is not disputed that the defendant is in the business of retailing food products to consumers. Nor do the facts show anything to indicate that the profit making transaction for the company is any other than the sale of merchandise on the retail store shelf to the individual food buyer. We may take it that defendant's canning of vegetables, its roasting of coffee, baking of bread and all the other acts done in preparing and assembling food products for sale are part of a plan whose terminus is the retail sale over the counter to the consumer. From the standpoint of

---

3 Most of the goods delivered to the retail stores come from defendant's warehouses. However, there are some "drop" shipments to the stores direct from companies defendant deals with and from defendant's own processing and manufacturing plants.

4 This is due, at least, in part, to the differences in transportation charges, due to varying distances and means of transportation, which are included in the cost.

business integration, it might conceivably be assumed that this whole enterprise is an "establishment". However, it is quite another thing to say that it is a retail establishment when it engages in so many important operations other than retailing, even though the retail sale is the event from which the defendant's income is derived.

The Administrator, provided for in the statute, has expressed a view contrary to the defendant's position in the Interpretative Bulletin, issued by the Wage and Hour Division of the United States Department of Labor, defining the scope and applicability of § 13(a) (2). Interpretative Bulletin No. 6, Retail and Service Establishments (June, 1941). Each of the defendant's retail stores under this interpretation, comes within the exemption as a single physical place of business, but not the "warehouses, central executive offices, manufacturing or processing plants, or other nonretail selling units which distribute to or serve stores".[5]

▮ Section 13(a) (1) of the statute gives the Administrator authority to define and delimit terms used therein by regulation. Section 13(a) (2) does not give such an authorization to him. Nevertheless, the interpretation is relevant for judicial consideration and persuasive, even though not authoritative, as the " 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new' ". United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345.

The meaning to be attributed to the term "retail establishment" need not, however, rest upon administrative interpretation alone. Consideration of the legislative history shows clearly, we think, what was in the mind of the Congress when this term was written into the Act.

Section 13(a) (2) was not contained in the original drafts of the Act.[6] The only provision prior to the inclusion of § 13(a) (2) which dealt with retailing was § 13(a) (1) [7] which exempted any employee employed "in a local retailing capacity". This failed to satisfy some of the members of the House who seriously doubted that it covered intrastate "retailers" situated near state lines and making occasional interstate sales. What the Congressmen meant by the use of that term "retailer" is discernible from their questions and comments. Representative Dempsey, prior to the adoption of the amendment, asked whether the bill could "in any way affect such business as that of the local grocery-man, druggist, clothing store, meat dealer —any merchant, in fact—laundry, hospital, hotel, or even transportation companies operating solely within a State?"[8] Representative Massingale offered an amendment and stated it was "for the purpose of protecting what you would call the corner grocery store man or the filling-station man".[9] The House voted down all amendments to achieve this purpose upon the insistence of Representative Norton that the Bill amply covered the problem until Representative Cellar offered his amendment. It exempted "any retail industry, the great-

---

[5] The relevant statements follow:

"33. * * * The word 'establishment' as used in section 13(a) (2) ordinarily means a physical place of business. In the case of the independent grocery store or butcher shop, the entire business is conducted in a single establishment."

"34. The term 'establishment' is not synonymous with the words 'business' or 'enterprise' as applied to multi-unit companies. * * *"

"37. The question has been raised as to the scope of the term 'establishment' in the case of chain-store systems, branch stores, groups of independent retailers organized to carry on business in a manner similar to chain-store systems, and retail or service outlets of large manufacturing or distributing concerns. In the ordinary case, each physically separated unit or branch store will be considered a separate establishment within the meaning of the exemption. The exemption, however, does not apply to warehouses, central executive offices, manufacturing or processing plants, or other nonretail selling units which distribute to or serve stores. These are physically separated establishments which do not have the characteristics of retail or service establishments."

[6] S. 2475 and H.R. 7200, 75th Cong., 1st Sess., May 24, 1937.

[7] § 2(a) (7) of the Senate Committee Bill introduced July 8, 1937.

[8] 83 Cong.Rec. 7299 (1938). See also Joint Hearings before Senate Committee on Education and Labor and House Committee on Labor on S. 2475 and H.R. 7200, 75th Cong., 1st Sess. (1937) 35.

[9] 83 Cong.Rec. 7436 (1938).

er part of whose sales is in intrastate commerce". This, he argued indicated "in the clearest way that retailing is exempted". If it were accepted, "then retail dry goods, retail butchering, grocers, retail clothing stores, department stores will all be exempt".[10] The amendment was accepted.

It is to be noted, as defendant points out, that the Cellar amendment applied to any "retail industry". Whether defendant's business structure falls within that category, we need not determine, for as the amendment finally emerged it exempted any "retail establishment". This we think limited the exemption to the type of retailing businesses, the intrastate retail store, originally contemplated in the House discussion.

It is apparent from the legislative history of § 13(a) (2) that Congress did not intend to exempt as a "retail establishment" a business of the kind defendant conducts. A multi-state business structure engaged in manufacturing and processing food products, warehousing and distribution of food items to over 2000 retail stores is not at all comparable to the intrastate "local" or "corner grocery man", "druggist", "meat dealer", "filling-station man" or even "department store" about whom the legislators were concerned. They are totally dissimilar whether the standards of comparison be economic, functional or physical. The correctness of this conclusion is, we think, settled by the latest word of the Supreme Court upon the point. In Walling v. Jacksonville Paper Co., 1943, 63 S.Ct. 332, 337, 87 L.Ed. —, Mr. Justice Douglas said for the Court: "It is quite clear that the exemption in § 13(a) (2) was added to eliminate those retailers located near the state lines and making some interstate sales. * * * And the exemption for retailers contained in § 13(a) (1) was to allay the fears of those who felt that a retailer purchasing goods from without the state might otherwise be included." This statement, we think, disposes of the defendant's point that unless § 13(a) (2) is construed according to its contention it is meaningless because the retail store employees are already covered by § 13(a) (1).

The defendant points to dictionary definitions of the word "establishment" showing the term to include "business organization", "business concern". Dictionary authority, however, may also be found for a definition which coincides with the Administrator's interpretation.[11] Even though the dictionary definitions do not thus cancel out each other as a guide to the application of the statute, we should not be justified in a literal application of words where they would lead to a result plainly at variance with the policy of the legislation as a whole. See United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345. If defendant's interpretation were to be adopted, any manufacturer or wholesaler, no matter how large, would bring himself within the exemption through establishment of his own retail outlets for sale to intrastate customers.[12] The legislative policy of the Act as expressed in § 2 is not to be defeated by such artificial enlargement of two words used in an exemption clause.

Our conclusion is that defendant's business is not a retail establishment within the meaning of § 13(a) (2) and that the learned District Judge was correct in so concluding.

II. Are all the warehouse employees within the Act?

---

[10] Id. at 7437, 7438.

[11] Thus, the New Century Dictionary (1942) 517, defines establishment as "an organized business concern, or the building occupied by it." Webster's New International Dictionary (2d Ed.1941) 874 defines it as "The place where one is permanently fixed for residence or business; residence, including grounds, furniture, equipage, retinue, etc., with which one is fitted out; also, an institution or place of business, with its fixtures and organized staff; as, large *establishment;* a manufacturing *establishment.*" Furthermore, even if defendant's definition of "establishment" were accepted, it would by no means follow that the American Stores

Company performing the gamut of business operations it does could properly be classified as a retail establishment.

[12] An attempt to partially exempt "handlers", "distributors" and "wholesalers" of certain agricultural products was defeated while the Act was being considered. 83 Cong.Rec. 7421, 7422 (1938). After the statute was enacted, numerous other attempts to grant particular total exemptions to employees engaged in wholesale businesses were made. See, S. 3048, H.R. 8323, 76th Cong., 3d Sess. (1940); S. 3180, H.R. 8045, 76th Cong., 3d Sess. (1940); 86th Cong.Rec. 5267 (1940); id. at 5457; id. at 5474. They all failed.

Each of four of the defendant's warehouses makes deliveries only to stores which are in the state where the warehouse is located. These are warehouses in Orange and Newark, New Jersey; Wilkes-Barre, Pennsylvania and Syracuse, New York. The court below held that certain employees of each of these who did not participate in the handling of the goods coming to the warehouse from out of the state nor in the shipment of goods to one of defendant's subsidiaries were not engaged in commerce as defined by the Act.[13] This conclusion is the basis of the appeal by the Administrator who contends that all the warehouse employees are within the protection of the Act because they are engaged in commerce.

■ In the decision of this question, we know that the Act is not coextensive with the limit of the power of Congress over commerce; further, that there is no dependable touchstone to determine whether employees are engaged in commerce; the problem is one of drawing lines. A. B. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. The lines are to be drawn after "analysis of the various types of transactions and the particular course of business. * * *" Walling v. Jacksonville Paper Company, 1943, 63 S.Ct. 332, 337, 87 L.Ed. ——. See also Higgins v. Carr Bros. Co., 1943, 63 S.Ct. 337, 87 L.Ed. ——, decided the same day as the Jacksonville Paper Company case. To the factual situation then we turn.

The parties have stipulated that the operations of the warehouse at Orange, New Jersey, are typical of all the four warehouses in question. No manufacturing or processing is done in this warehouse. Goods from many states [14] arrive at the warehouse either by trucks or railroad cars and are unloaded at receiving platforms where they are recorded by receiving clerks. They are then taken on small trucks to an elevator which unloads them at various floors where they are picked up and stacked in proper places. As store orders for merchandise, prepared on forms which correspond with the location of goods in the warehouse, come in, the goods are assembled, taken to the loading platform, recorded and shipped. Each warehouse has its own office.

There is a fairly even flow through the warehouses and it is the defendant's policy to avoid over-stocking. Buyers order in anticipation of the regular and continuous requirements of the stores. The buyer is guided by past experience and makes considerable allowance for seasonable factors and merchandising programs. The method of operation is designed to keep the goods moving. Different items have different turn-over rates. Many items turn over within a week. The average turn-over at Orange is in excess of 16 times annually; at Newark, where perishable goods are distributed, the rate of turn-over is over 112 times annually. Grocery deliveries to stores are made one to three times a week; fruits and vegetables are delivered three to six times a week. There are two shifts of employees at the warehouse to insure continuous movement of goods through the warehouse.

The Orange warehouse is closely tied to the Philadelphia office. Records of inventories, receipts and deliveries are regularly forwarded to the main office. In addition, there is a daily contact through letters, telegrams and telephone talks and branch buyers also clear purchases with the main buying department. Payroll funds are replenished weekly and other necessary operating expenses are paid from Philadelphia.

It was found as a fact by the trial judge that no one of the warehouses is the ultimate destination of any of the vast quantities of foodstuffs and other products which pass through it.

■ We think that these facts, which are undisputed, provide evidence going far beyond that of the "wholly general character" which was before the Supreme Court in the Jacksonville Paper Company case, supra. True, the deposit of the goods in the warehouse shows no evidence of being a ritual to give a plausible appearance of breaking interstate transit. We have no reason to think that the warehousing was for anything but the convenience of the defendant in doing business in what it regards as an efficient and economical way. Whether such a break would subject

---

[13] The definition in § 3(b) is " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof".

[14] Approximately 93% of the products passing through the Orange and Newark warehouses originate outside the state of New Jersey.

the goods to state taxation, as the defendant suggests, does not settle the question of the applicability of the statute here in question. A. B. Kirschbaum Co. v. Walling, supra.

Furthermore, it should be borne in mind in this case that we are not dealing here with the problem of an independent wholesaler. The entire operation from the purchase, manufacturing or processing of the goods to the ultimate sale to the retail purchaser is that of the American Stores Company. The warehouses supply goods to the defendant's retail stores and no others except where they deliver to one of the wholly owned subsidiaries of the parent company. The warehouse manager does not buy or resell to retailers at a profit; the warehouses are maintained by the company for convenience and distribution of the goods. We have then nothing comparable to "goods acquired and held by a local merchant for local disposition" as mentioned in the Jacksonville Paper Company case, but rather a situation where goods are shipped from one state and briefly warehoused in another for the convenience of the owner in making an efficient distribution of those goods to its local retail outlets.

We think the conclusion from these facts is clear that there is in this case a practical continuity of movement of the goods until they reach the defendant's retail stores. The maintenance of the warehouse, as we read the findings of fact, is not to break that continuity but to make it even, economical and uninterrupted. The conclusion, therefore, is that all of the defendant's warehouse employees are engaged in commerce within the meaning of the Act. This conclusion may go somewhat beyond that of our colleagues in the Seventh Circuit in Walling v. Goldblatt Bros., Inc., 7 Cir., 1942, 128 F.2d 778, certiorari denied 1943, 63 S.Ct. 528, 87 L.Ed. ——. But the court in that case did not have the advantage of the guidance given by the Supreme Court decisions of Walling v. Jacksonville Paper Company and Higgins v. Carr Brothers Company, referred to above.

To this extent the decision of the learned court below is modified. We think the modification can be effected by the deletion from the judgment of the District Court of the last three words of Division 5 and the last full paragraph. With this modification the judgment is affirmed.