**WALLING, Administrator of Wage and Hour Division, U. S. Dept. of Labor, v. FRED WOLFERMAN, Inc.**

No. 1694.

District Court, W. D. Missouri, W. D.

April 17, 1944.

918

Reid Williams and Henry J. Smith, both of Kansas City, Mo., for plaintiff.

R. B. Caldwell and Blatchford Downing, of Caldwell, Downing, Noble & Garrity, all of Kansas City, Mo., for defendant.

OTIS, District Judge.

The prime question presented by this case is whether the employees of defendant who are engaged in manufacturing, in one of defendant's stores, candy for defendant's retail food stores and solely for them are withdrawn from the coverage of the overtime wage provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., by reason of Section 213(a) (2) of that Act which provides that those provisions shall not apply to "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The defendant, Fred Wolferman, Inc., operates four stores, selling foodstuffs at retail, in Kansas City, Missouri, and one in Tulsa, Oklahoma. On the fifth floor of one of the Kansas City stores, on a portion of that floor, is a candy kitchen. Defendant's employees in that kitchen make candy which is sold only in the four retail stores in Kansas City. The employees in the candy kitchen are not paid one and one-half times the regular rate for hours of work in excess of forty a week as the Fair Labor Standards Act (29 U.S.C.A. § 207) requires, if it applies to these employees. Plaintiff asks injunctive relief.

No question is raised but that the business of defendant is retailing foodstuffs and, in a minor way, serving foods in restaurants in certain of its stores and that the greater part of its business is intrastate. If

the candy kitchen is a part of the retail and service establishment, then the employees working in the kitchen are engaged in "a retail or service establishment" and the wage provisions of the Act do not apply. If the kitchen is a factory, separate and distinct from the retail or service establishments, those provisions do apply, notwithstanding the common ownership of the kitchen and of the retail and service establishment.

It is obvious that there might be a manufacturing process so closely related and incidental to a retailing business as that none would argue it was separate and distinct. Making ice cream is manufacturing. Ice cream is sold at the fountain in the corner drug store. Perhaps a boy is employed to turn an ice cream freezer in an ante-room. All the cream he makes is sold in the store. Is not that manufacturing incidental to and a part of the retailing business? Again, there is a little store where loaves of bread are sold at retail. One person attends at the counter and sells to customers. Another, in a back room, gives all her time to baking bread to be sold. Is not that manufacturing purely incidental to the retailing? And would not the answers be the same if the soda fountain were a block long and the services of five boys turning freezers were required; if the demand for bread were so great that the services of five bakers manufacturing bread were required to meet it?

■■ Before we have read a single case cited by learned counsel it seems clear to us that manufacturing conducted by a retail merchant solely to serve his customers buying at retail over his counters, with no return except in the purchase prices paid by his customers buying at retail over his counters, it seems to us that that manufacturing is incidental to the retailing. Whether the counter over which he sells is ten feet long or a block long. Whether the retailer has one store or two or five. Whether the incidental manufacturing is carried on in the basement of a store or in the attic or in some other convenient place. We are convinced, therefore, that the manufacturing carried on in defendant's candy kitchen solely to provide candy for customers in defendant's retail stores is a manufacturing incidental to retailing and that, in the sense of the statute, the employees in the candy kitchen are employed in the retail establishment. But we must analyze the statute and read the cases.

## Our Interpretation.

■ Before we read the cases we must have in mind for what purpose they are to be read. They are to be read for aid in the interpretation of a single term in the statute. What is the meaning of the word "establishment" in the phrase "retail or service establishment", in Section 213(a)(2)? But is it necessary to read opinions to determine the meaning of the word "establishment"? We would be guided and bound, indeed, by any interpretation placed upon this word by the Supreme Court or the Circuit Court of Appeals for the Eighth Circuit. *There is no such interpretation.* In the absence of any such interpretation should we not strive first to find the true meaning of the word by resorting to established standards?

When we suggest we should strive to ascertain the true meaning of the word "establishment", we do not mean, of course, its complete meaning, the meaning which should be given to it in any case. Only to ascertain whether it has any such limited meaning as is contended for by plaintiff here, that is to say, whether the word "establishment" means *a single store* where goods are sold at retail.

■ The word "establishment" is a somewhat unusual word to be employed in this connection. Such an unusual word must have been selected deliberately. The word has no technical meaning in the law. It was not used in some predecessor statute of which the present is a development. The word was used in its ordinary meaning. For the ordinary meaning of any word we are accustomed to refer to the lexicographers. Webster's Dictionary defines this word. Of the several definitions in Webster's New International Dictionary, Second Edition, the only one which has any relevancy is No. 2. "Establishment—That which is established as * * * (d) the place where one is permanently fixed for residence or business; * * * an institution or place of business, with its fixtures and organized staff, as large *establishment*, a manufacturing *establishment*." Since this definition begins with the words, "That which is established," to arrive at the full meaning intended by the lexicographer we must investigate the meaning of the word "established," which is—"To make stable or firm; to fix immovably and finally. * * * " And we must look for the definition of the word "stable," which is "(1) Firmly established; * * *; solid; fixed; steadfast

* * * (3) durable * * * abiding; persisting; enduring. * * *"

Consideration of these definitions indicates that the emphasis in the word "establishment" is upon the concept of permanency, the "abiding, persisting, enduring" quality. An institution is established if there is permanency about it. There is nothing in the concept which limits it when, for example, it is applied to a given enterprise or a given business, to that part of the enterprise or business which is conducted under a single roof.

We are unable to conclude that there is anything in the word "establishment" (used in the phrase "retail establishment") as that word is defined in the dictionary which limits it to a single store. It is scarcely to be believed that the Congress, if it had intended by the word so limited a significance as is conveyed by the word "store", would not have said *"store."* The Congress would have used the common word, not the unusual word.

■ There is a rule of statutory interpretation to the effect that where there is an ambiguous term (we think the word "establishment" is not ambiguous) resort may be had to legislative history, such as the history of changes in the wording of a proposed statute in the course of its evolution, such as the declarations of committees reporting a bill for the consideration of either House. We have found nothing, however, in the legislative history of the Fair Labor Standards Act which throws any real light upon the word "establishment" or which suggests that it has any narrower meaning than that which the word usually conveys. (Hereafter in discussing one of the cases relied on by plaintiff we shall speak briefly of this matter.)

■■ There are some words in the Fair Labor Standards Act which the Congress itself believed required definition. It defined those words. Section 203. The word "establishment" is not one of the words so defined. That omission suggests that here was a word the Congress especially intended should be taken in its ordinary meaning. The Fair Labor Standards Act authorizes the Administrator of the Act to define certain terms. Section 213(a) (1). The word "establishment" is not one of the terms which the Administrator was authorized to

define and that is made especially conspicuous by the fact that the word "establishment" appears in Section 213(a) (2), whereas the authority conveyed upon the Administrator to define appears in the immediately preceding clause, namely, 213(a) (1). The rule expressio unius est exclusio alterius is here in point. One almost would be justified in saying that the Administrator by implication is denied the authority to define "establishment" (except indeed for his own guidance until authoritative judicial tribunals have spoken).

■ It seems to us then that the words "retail * * * establishment", whatever they may not include, certainly do include a business enterprise confined to four units in a single city and one unit in another, all retail stores, all under a single management. We cannot believe that *one* establishment, occupying a city block, is *four* establishments, because there is an entrance on each side of the square, four entrances. We cannot believe that *one* establishment is *two* establishments, because an alley or a street may divide one part from another. We cannot believe that *one* establishment is *four* establishments, because, for the greater convenience of customers, there are four separate locations in the same city, in each of which the same character of business is transacted, all under the guidance of a single management.[1]

There must have been some reason why "retail * * * establishments" were excepted from the Fair Labor Standards Act. Whatever that reason was (there are different theories about that), it is not conceivable that the reason would apply to a retail business conducted in one building, but would not apply to a retail business, a single business under a single management, conducted in two buildings, one separated from the other by an intervening street or alley. Or to one conducted in four buildings or in five.

### Supporting Authorities

What seems to us to be a reasonable interpretation of the word "establishment" has seemed reasonable to others. We refer to a few cases. In Allesandro v. C. F. Smith Co., 136 F.2d 75, decided by the Circuit Court of Appeals for the Sixth Circuit on June 3, 1943, it was held that the busi-

---

[1] In this paragraph we have spoken of four separate units instead of five. As the formal findings of fact indicate, products manufactured in the defendant's candy kitchen were not, at the time of the trial, being sent to the store in Tulsa, Oklahoma.

ness of the defendant was a "retail establishment" although it operated through numerous outlets, indeed through several hundred retail grocery stores. The Administrator, appearing as amicus curiae in that case, contended there as here that a retail establishment is a single store. That theory emphatically was rejected. See also Walling, etc., v. L. Wieman Co., 7 Cir., 138 F.2d 602 where it was held that sixteen stores and warehouse and general offices constituted a "retail establishment." And Walling, etc., v. Block, 9 Cir., 139 F.2d 268 where it was held that nineteen stores and a warehouse and general offices constituted a "retail establishment." In Veazey Drug Co. v. Fleming, Administrator, D.C., 42 F.Supp. 689, it was held that a retail drug company operating twenty retail stores in Oklahoma City was engaged in conducting a "retail establishment." The theory contended for by the Administrator, that a retail establishment means a single store, emphatically was rejected by the court. See also White v. Jacobs Pharmacy Co., D.C., 47 F.Supp. 298, where it was held that eighteen stores and a warehouse and general offices constituted a "retail establishment."

## Views Contra.

We admit that the Administrator does not agree with our interpretation of the word "establishment" or with the interpretations of the Circuit Courts of Appeals for the Sixth, Seventh and Ninth Circuits. The Administrator has issued a solemn pronouncement to the effect that "the unit store constitutes the retail or service establishment contemplated by the exemption granted by Section 213(a) (2)" and again that "each physical operating unit or branch store is to be considered as a separate establishment where there are several stores conducted under a common management."[2] With the greatest possible respect for the Administrator, who undoubtedly is charged with grave duties and has fulfilled them with real ability, and with the greatest possible respect for the Administrator's learned counsel, who are lawyers of outstanding capacity (especially is that true of the lawyers who appeared for plaintiff in this case),[3] we are unable to agree that much more authority is to be attributed to the declaration of the Administrator, the plaintiff in this case, than would be attributed to the declaration of the defendant. Of course we are aware of the rule that the interpretation of an agency of the government charged with the enforcement of a statute is entitled to *some* weight when courts are called upon to interpret ambiguous provisions in a statute. For one thing, the interpretation of an ambiguous provision by a governmental agency during a long period of time and the acceptance of that interpretation by the public indicates the understanding of bench and bar as to the meaning of the ambiguous provision. Here, however, there is no ambiguous provision. Here, moreover, there is no long continued interpretation by an executive agency. The Fair Labor Standards Act itself is scarcely out of its swaddling clothes. There has been no showing that the interpretation of the Administrator has been accepted generally. Indeed, we can take judicial notice of the fact, from a consideration of the several opinions which have been handed down by the most distinguished courts, that there has not been general acceptance by the bench and bar of the Administrator's interpretation. If the Administrator's interpretation weighs anything, it would be a delicate set of scales that would measure its weight.

Opinions of the court are in a different category from the pronouncements of administrative agencies. Any well considered judicial opinion, in whatever jurisdiction rendered, which would support the Administrator's contention in this case, that the business of the defendant operating through four or five stores is not a retail establishment, but is, on the contrary, four or five separate retail establishments, would merit careful study. We must say, however, that we have not found a single case which supports any such interpretation. The one case on which plaintiff chiefly relies, and which comes nearest to supporting his theory, is Welling, Administrator, v. American Stores Co., 3 Cir., 133 F.2d 840, 842, a decision of the Circuit Court of Appeals for the Third Circuit, opinion by Judge Goodrich, a great scholar in the field of law and an eminent jurist.

The slightest examination of the American Stores case reveals how completely distinguishable it is on the facts from the present case. The defendant company in that case operated eleven warehouses in five states, seven bakeries in three states, two canneries, a large food processing and

---

[2] Our quotation is from plaintiff's brief.

[3] Mr. Henry J. Smith, who led for plaintiff, exhibited unusual ability both in cross examination and argument.

manufacturing plant, and a number of other enterprises and it conducted 2300 retail stores in a number of states. The conclusion of the court that such a complex conglomerate was not, in any true sense, a single retail establishment, easily might be accepted by all. The reasoning by which the court reached its conclusion was, first, that it was consistent with the Administrator's interpretation which, however, was recognized as not authoritative, only persuasive, and second, that the legislative history of the Act suggests that Congress did not intend to exempt as a retail establishment a business *of the kind* described. Not a word in the opinion suggests that if the court had been dealing with a business enterprise such as is present in the instant case the court would have reached the ...clusion that enterprise is not a retail establishment. Not a word in the opinion suggests that the legislative history of the Act indicates that by "retail establishment" a single unit was intended.[4]

### Findings of Fact.

*Historical*

1. Defendant, Fred Wolferman, Inc., owns and operates, as a single business, five stores selling foodstuffs at retail, four in Kansas City, Missouri, and one in Tulsa, Oklahoma. All are under one management. The combined business of the stores is large and represents a growth of more than fifty years. The business was begun as a small store with one delivery wagon drawn by one horse. The founder was Fred Wolferman who is now the President of Fred Wolferman, Inc. The development of the business is attributable to the service rendered by it to the buying public.

*Candy Kitchen*

2. One of the commodities sold in the defendant's stores is candy. For the purpose of supplying its customers with a high grade of candy, freshly made, defendant maintains in one of its Kansas City stores, on a part of the fifth floor of that store, a candy kitchen. In that kitchen certain employees of the defendant make candy. That candy is made exclusively for sale in defendant's Kansas City stores (formerly some candy was sent to the store in Tulsa). Some candy, having been bought by customers at the stores, is sent to them or on their order by mail. Also in this kitchen certain sauces are made which chiefly are used in restaurants operated by defendant in one or more of its local Kansas City stores.

*Warehouse and General Office*

3. Connected with one of defendant's Kansas City stores by an underground passage is a warehouse for the exclusive service of defendant's stores. In one of the stores a general office is maintained for the exclusive service of the stores.

*Coffee Roaster*

4. In one room in the warehouse green coffee is stored, blended and roasted. It is roasted in a single coffee roaster by one man, exclusively for defendant's Kansas City stores (formerly also for the Tulsa store).

*Ice Cream*

5. Formerly ice cream for the exclusive use of defendant's Kansas City stores, restaurants, and soda fountain was made by one employee, working part time, in a small part of one of defendant's Kansas City stores.

---

[4] Two of the cases cited by learned counsel for plaintiff seem to us to have no real bearing upon the question involved. In one of them, Collins v. Kidd Dairy & Ice Company, 5 Cir., 132 F.2d 79, the defendant was primarily a manufacturer of ice. It sold ice to independent dealers, although the defendant owned the ice houses in which the independent dealers operated. Also it sold ice to other retailers and to wholesalers. The court rightly held that such a manufacturer could not be said to be conducting a "retail establishment." In another case cited, Davis et al. v. Goodman Lbr. Co., 4 Cir., 133 F.2d 52, the business of defendant was retailing lumber. It conducted also, however, a small manufacturing business which employed only two men. That manufacturing business was in no sense incident to the retail business conducted by the company. The things which were manufactured were not manufactured for the use of the retail yards of the company, but for sale otherwise. There is nothing inconsistent between the ruling in this case and our views as expressed in the instant case. Undoubtedly if in the candy kitchen here candy was manufactured, not for sale through defendant's retail stores, but for sales to customers other than at the retail stores, that manufacturing would not be incident to the defendant's retail business. It would be a separate and independent enterprise whether it employed seventeen persons or two persons, or only one person.

*Employees Involved*

6. (a) Seventeen of defendant's employees work in the candy kitchen. They work regularly 51 hours a week and are not paid at an overtime rate for more than 40 hours.

(b) Defendant's general office employees (eleven in number) work regularly 47½ hours a week and are not paid at an overtime rate for more than 40 hours.

(c) Defendant's warehouse employees, five in number, work, in some instances, as much as 50 hours a week. None is paid at an overtime rate for more than 40 hours.

(d) Defendant's coffee roaster occasionally works 44 hours a week and is not paid at an overtime rate for more than 40 hours.

(e) Defendant has certain other employees—two freight elevator operators, an engineer, an electrician—who sometimes work more than 40 hours a week. None is paid at an overtime rate for more than 40 hours.

7. The work of all employees of defendant is incidental to its business of selling foodstuffs at retail and to its restaurant business.

*Miscellaneous*

8. The business of defendant is a single retail and service establishment, the greater part of whose selling or servicing is in intrastate commerce.

9. The defendant has not complied, as to records kept by it, with the requirements of Sec. 211(c), Title 29 U.S.C. for the reason that it has been advised those requirements do not apply to it.

### Conclusions of Law.

1. The burden of proof is on defendant to show that its whole business was a "retail * * * establishment" and that, therefore, it is entitled to the exemption conferred by Section 213(a) (2).

2. The business of the defendant as described in the findings of fact is a "retail * * * establishment" within the meaning of Section 213(a) (2). All of the employees referred to in the findings of fact who have been engaged for more than forty hours a week are employed in a "retail * * * establishment" and are not entitled to be paid at the overtime payment rate established by the statute and regulations. The requirements of Sec. 211(c) as to records does not apply to defendant.

3. Defendant's objection to plaintiff's exhibit 2, which objection was taken under submission, should be and it is overruled.

### Another Matter.

The conclusions of law we have announced would be the same if we did not accept at full face value the declaration of the president of defendant that the defendant has discontinued sending candy manufactured in its candy kitchen and roasted coffee to the store in Tulsa, and did not intend to resume doing so, that it had discontinued making ice cream for any of its stores, that it had obeyed the law as it understood the law and would cheerfully obey the law, as understood by plaintiff, if that is finally declared in this case to be the law. These declarations were repeated by defendant's learned counsel, outstanding lawyers at the bar of this court. Learned counsel for plaintiff seemed to look askance upon these declarations of purpose and even to suggest, although the suggestion was not baldly nor impolitely put, that here possibly was equivocation and double dealing. Defendant, said counsel, which has discontinued sending candy and roasted coffee to Oklahoma and making ice cream for its stores may start these things again, whenever it appears it would be profitable. Defendant's declaration of a desire to comply with the law, said counsel, should be taken with a grain of salt. It has not, said they, complied heretofore with the Administrator's interpretation of the law and with the Administrator's directions.

Of course the mere cessation of unlawful activities while an injunction suit is pending is no conclusive reason for a denial of the injunction asked. If the court believes that the cessation of activities during the pendency of the case is not in good faith, but a mere dodge, then, or course, the court will issue the injunction. Walling, etc., v. Mutual Wholesale Food & Supply C., et al., 8 Cir., 141 F.2d 331.

It is impossible, however, to believe that this defendant has not acted throughout its controversy with plaintiff in good faith. It has believed it was right in its interpretation of the law and we believe it was right. It was advised by outstanding counsel that it was right. Why should its president not have acted in accordance with his conscientious belief and the advice of counsel? The American citizen is not yet required, like a trained animal in a circus, to jump through a hoop at every crack of the whip of an

agency of the executive. And as to whether a declaration of intention is to be accepted at face value or is to be rejected and disregarded, that depends upon the character of the man by whom the declaration of intention is made. The president of the defendant company impressed us on the witness stand as a man of integrity. We noted that he would not even say that he would abide by the judgment of *this* court, but said, in effect, he would abide by the judgment of the highest court. That might not have been a diplomatic announcement to make, but it was consistent with the American character. His whole conduct and demeanor in court were those of an honest man, an impression corroborated by the agreed statement of facts which sets out that this man has so served the people of Kansas City for fifty years that his business has grown from one of trifling proportions to a great and successful enterprise. The declaration of such an individual is not to be put in the same category with that of some fly-by-night.

### Judgment and Decree.

This case coming on to be heard upon the pleadings, the evidence introduced and the argument of counsel, and the Court being fully advised in the premises and having made Findings of Fact and announced Conclusions of Law:

It is ordered, adjudged and decreed that the complaint be and it is dismissed.