FRED WOLFERMAN, Inc., v. GUSTAFSON
et al.

No. 13662.

Circuit Court of Appeals
Eighth Circuit.

Aug. 25, 1948.

Rehearing Denied Sept. 21, 1948.

Robert B. Caldwell and Blatchford Downing, both of Kansas City, Mo. (John W. Oliver and Caldwell, Downing, Noble & Garrity, all of Kansas City, Mo., on the brief), for appellant.

Henry A. Riederer, of Kansas City, Mo. (Fred J. Freel, of Kansas City, Mo., on the brief), for appellees.

William S. Tyson, Sol., Bessie Margolin, Asst. Sol., Frederick U. Reel, and Helen Grundstein, Attys., Department of Labor, all of Washington, D. C., and Reid Williams, Regional Atty., Department of Labor, of Kansas City, Mo., for Administrator of the Wage and Hour Division, United States Department of Labor, amicus curiae.

Before SANBORN, JOHNSEN, and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one to recover overtime compensation, liquidated damages and attorney's fees, under section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), for services rendered during the years 1940 to 1945 inclusive. The trial court gave judgment for the employees, and the employer has appealed.

The employees involved worked in a candy kitchen, located in part of the seven-story building in downtown Kansas City, Missouri, which housed a retail food store operated by the employer and the public restaurants run in connection with it. The employer operated three other retail food stores at different locations in Kansas City and one in Tulsa, Oklahoma. During part of the period in suit, it had also operated a store in Oklahoma City.

The candy kitchen was used for manufacturing fine chocolate candies, mayonnaise and other salad dressings, for sale in the employer's several stores.[1] Until 1942, when the Oklahoma City store was discontinued, shipments of such candy and salad dressing had been made from Kansas City to that store. Shipments also were made to the store at Tulsa until early in

---

[1] Part of the mayonnaise and other salad dressings was consumed by the public restaurants operated by the employer in two of its Kansas City stores.

1944. After that time, the products of the candy kitchen were sold only through the four Kansas City stores. But part of the candy and salad dressing manufactured by the employees and so sold still directly entered the channels of interstate commerce. Thus, the employer made deliveries of purchases from the stores by truck to customers in Kansas, who resided in the area immediately adjacent to Kansas City, Missouri. And candy purchased at the stores or ordered by mail also was forwarded by the employer into other states by parcel post.

The public did not have general access to the candy kitchen, and no sales were made there. The employees of the candy kitchen were engaged exclusively in carrying on its manufacturing activities and in packing and wrapping such candy as was to be forwarded to purchasers.

While the value of the candy produced in the candy kitchen represented only from 2½ to 3½ per cent of the total sales of goods made at the employer's stores during the period in suit, and the salad dressing approximately only 1¼ per cent, the amount of such candy sales in dollar volume ranged from $84,500 in 1941 to $166,950 in 1945, and the sales of salad dressing from $42,680 in 1941 to $73,100 in 1945.

The employer concedes here that the situation was one in which the trial court was entitled to hold that the employees of the candy kitchen were engaged in the production of goods for commerce, within the meaning of that term under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. It contends, however, that the court erred in not holding that such employees nevertheless were within the exemption of section 13(a) (2) of the Act, 29 U.S.C.A. § 213(a) (2), as being employees "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

In substance, the argument made is that the production of candy and salad dressing in the candy kitchen was simply an incident in the conduct of the employer's stores; that the candy kitchen was operated as a component part of the food store in which it was located; that this food store (as well as each of the employer's other stores) was wholly a retail establishment, within the exemption of section 13(a) (2), since its sales, as shown by the undisputed evidence, were made to household consumers and less than 10 per cent of its total sales by dollar volume was in interstate commerce; and that the exemption of the store as a retail establishment embraced the activities of the candy kitchen, as being a component part of the store and an incident in its operation.

The trial court rejected this contention and argument, on the ground that to engage in manufacturing was not in economic aspect immediately incidental to the business of retail selling; that the production activity of the candy kitchen, therefore, although carried on in the retail store building and managerially made a part of the business of operating the store, could not be said to be one of the generally inherent and recognizedly incidental functions of an ordinary retail establishment, such as section 13(a) (2) must be regarded as having been designed to exempt; and that in this situation, and since the operations of the candy kitchen constituted in fact the production of goods for commerce, in competition with candy produced by the employees of other manufacturers in interstate commerce, the employees of the candy kitchen, as much as the employees of such other candy manufacturers, should be held to be within the coverage of section 7 of the Act.

Some of the earlier decisions lend support to the employer's position here. But the point has been passed where such general manufacturing activities as the operator of a retail establishment may choose to engage in for reasons of his own, which constitute in fact the production of goods for commerce, under the definition of section 3(i) and (j), 29 U.S.C.A. § 203(i) and (j), can justifiably be accorded economic refuge in the exemption of section 13(a) (2), as against the coverage provisions of the Act. To the extent that a retail establishment engages in the production of market goods, it steps outside the institutional character and economic function, for which section 13(a) (2) would seem to have been designed to provide exemption.

And the economic effect, attritively and aggregately, in relation to the purposes of the Act, if employees, who in fact are engaged in the production of goods for commerce, were to be held exempt from the benefits of sections 6 and 7, because their production activities are performed under the roof of a retail establishment and are made to serve a purpose of that business, hardly requires demonstration.

■ As the Supreme Court has said, "Production and distribution are different segments of business." United States v. Silk, 331 U. S. 704, 712, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757. In economic aspect, retail establishments have inherently and traditionally been instrumentalities of distribution. And their distributional function fundamentally has been one that is performed on a local-community and household-consumer level. It is in this function and on this level, we think, that section 13 (a) (2) is intended to afford exemption to a retail establishment from the minimum-wage and overtime-compensation provisions of the Fair Labor Standards Act.

"The origin of this clause, § 13(a) (2), had nothing to do with establishments producing goods for [interstate] commerce'. It is rare, if not impossible, for an employee who is engaged [in the production of goods for commerce or] in an occupation necessary to the production of [such] goods * * * to be said to be at the same time an employee engaged in a retail or service establishment whose selling and servicing is confined to ultimate consumers. These employments are largely mutually exclusive." Roland Electrical Co. v. Walling, 326 U.S. 657, 667, 66 S.Ct. 413, 417, 90 L.Ed. 383. And in the present situation as has been previously indicated, the employees of the candy kitchen, in the nature of their tasks and the result of their work, were as exclusively engaged in the activities and incidents of production as if they had been performing their tasks in an independent candy factory.

Again, in slightly different terms, as the Court expressed it in A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 497, 65 S.Ct. 807, 810, 89 L.Ed. 1095, 157 A.L.R. 876, "Con-gress was interested [only] in exempting those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store." It is difficult to see how the production in a retail store of from $127,-000 to $240,000 worth of market goods per year can be said to constitute such activity as is customarily engaged in by "those employed by small local retail establishments, epitomized by the corner grocery, the drug store and the department store." But even if it were possible to argue that production of this type represented a normal and recognized incident in the operation of a retail food store and that the candy kitchen therefore should be accorded a componency in that store for the purposes of the Act, the argument still would not avail here,. because the candy kitchen did not just have a componency in the store in which it was located, but it was made to serve as a source of production for the employer's other stores as well.

■ And so, in the nature of their activity and in relationship to the economic significance of their hiring, the employees of the candy kitchen were not in our opinion "engaged" in a retail establishment, within the use of that term in section 13(a) (2). Beyond this, in serving as a production agency for the employer's other stores, the candy kitchen was in any event more than simply a component in the operation of the retail establishment in which it was located. And within the purview of the Act, establishment componency could hardly be claimed in the other stores, with which the candy kitchen lacked physical and operational integration. Each of these aspects would alone be sufficient to make the exemption of section 13(a) (2) inapplicable to its activities. The withdrawal, under section 13(a) (2), of employees engaged in a retail establishment, from the coverage of sections 6 and 7 of the Act, does not, we think, extend beyond the economic unitariness, the functional unitariness and the physical unitariness which has traditionally characterized such a business on the local-community and household-consumer level.

The trend of the decisions is supportive of these views. In Davis v. Goodman Lumber Co., 4 Cir., 133 F.2d 52, where a retail lumber yard had engaged to a small degree in the manufacturing of mill rollers, it was held that the exemption of section 13(a) (2) did not apply to the employees of that department in the yard. In Walling v. Goldblatt Bros., 7 Cir., 152 F.2d 475, certiorari denied 328 U.S. 854, 66 S.Ct. 1340, 90' L.Ed. 1627, the employees of a warehouse, used in supplying goods only to a particular store of the employer and connected to the store building, and the employees of a drapery workshop, located in part of the warehouse building and manufacturing drapes for sale by the particular store and by other stores of the employer, were held not to be within the exemption of the particular store as constituting part of a retail establishment.

In Armstrong Co. v. Walling, 1 Cir., 161 F.2d 515, it was held that a commissary located in the North Station at Boston, which was connected by means of an arcade with the several sandwich and refreshment stands operated by the employer in the concourse of the station, and which was used as a kitchen and storeroom for such stands and for other stands of the employer within and outside the State of Massachusetts, was not exempt under section 13(a) (2) as being a retail establishment or as constituting a part of such an establishment. In Western Union Telegraph Co. v. McComb, 6 Cir., 165 F.2d 65, 71, where telegraph desks or offices had been located in retail stores and hotels, it was held that the telegraph workers "are not withdrawn from the coverage of the Fair Labor Standards Act * * * because of the location of the telegraph office in a retail or service establishment." See also Walling v. American Stores Co., 3 Cir., 133 F.2d 840; Guess v. Montague, 4 Cir., 140 F.2d 500; Wabash Radio Corporation v. Walling, 6 Cir., 162 F.2d 391.

Again, the views which we have expressed above are reinforced by the interpretation made by the Administrator of the Wage and Hour Division, which, as the Supreme Court has repeatedly emphasized, is entitled to great weight. Paragraph 36 of Interpretative Bulletin No. 6 issued by the Administrator is expressly applicable: "If any department in the store is engaged in manufacturing operations, the exemption applicable to the rest of the store is not applicable to that department." And on the status of the candy kitchen from its relationship to the employer's other stores, paragraph 17 of the Interpretative Bulletin is pertinent: "An establishment which is engaged in manufacturing is not a retail establishment even though the goods which it manufactures are distributed at retail."

From all of the foregoing, we can not say that the trial court erred in holding that the employees of the candy kitchen were within the general coverage of section 7 of the Act, and in refusing to hold that they were within the exemption of section 13(a) (2).

There still remains for consideration, however, whether, while such employees were within the coverage of the Act, the trial court nevertheless was in error in refusing to relieve the employer from all liability on the claims involved, under section 9 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258, enacted after the suit was instituted, or in any event from liability for liquidated damages, under section 11 of that Act, 29 U.S.C.A. § 260.

Section 9 of the Portal-to-Portal Act relieves an employer from any liability for a failure to pay minimum wages or overtime compensation under the Fair Labor Standards Act occurring prior to the enactment of the Portal-to-Portal Act, "if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged." The section further provides that "Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy

is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

Section 11 of the Portal-to-Portal Act provides that "In any action commenced prior to or on or after the date of the enactment of this Act to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16(b) of such Act."

The employer predicates its right to relief from liability, under each of these two sections of the Portal-to-Portal Act, primarily upon the facts that the Administrator of the Wage and Hour Division had in 1944 sought an injunction against it under the Fair Labor Standards Act with respect to the employees of the candy kitchen; that the trial court in that suit had denied the Administrator an injunction and had held that the employees of the candy kitchen were within the exemption of section 13(a) (2) as being employees engaged in a retail establishment (Walling v. Fred Wolferman, Inc., D.C.W.D. Mo., 54 F. Supp. 917); that the Administrator had taken an appeal to this Court from the trial court's order and judgment but later had voluntarily filed a motion to dismiss his appeal and had obtained from this Court an order of dismissal (Id, 8 Cir., 144 F.2d 354); and that this voluntary and unexplained dismissal amounted to an administrative interpretation, upon which the employer was entitled to rely and on which it had in fact and in good faith relied in its actions.

The trial court made an express finding that the employer had in fact and in good faith relied upon the court's decision and the Administrator's voluntary act in dismissing his appeal from the injunction denial and on the implication which the employer gave to the Administrator's action as a basis for not making payment of overtime compensation to its candy kitchen employees. In relation to section 9 of the Portal-to-Portal Act, however, the court concluded that the act of the Administrator in dismissing his appeal could not, without more, be said to fall in the category of an "administrative regulation, order, ruling, approval, interpretation," as those terms are used in section 9.

No explanation for the dismissal of the appeal is contained in the record. It could conceivably have involved an "approval" or "interpretation" by the Administrator at the time with respect to the employer's course of action, but it is not shown that this was the fact. On the other hand, the reason for the dismissal could have been mere expediency in relation to some practical consideration.

Legally, of course, every judgment which becomes final has certain inescapable effects, but these are compulsions of law and can not be said to create in fact an actual approval of the adjudication. This is true abstractly whether the finality is derived from an appellate disposition of the case on its merits, from a voluntary dismissal of an appeal before a hearing as a matter of expediency or necessity, or from a failure to take an appeal for any such reason. In each instance, personal approval may exist or it may not, and the fact of its existence therefore depends upon something more in the way of evidence.

And so the trial court can not be said to have erred in holding that the mere dismissal by the Administrator of his appeal in the injunction suit did not of itself constitute an "administrative interpretation," within the language of section 9 of the Portal-to-Portal Act. Even more concretely, the language "administrative regulation, order, ruling, approval, interpretation" in section 9 seems to us to have reference only to some formalized expression by the Administrator and not to any conduct or action on his part from which an employer may undertake to make deductions.

Such a formalism is, we believe, inherent in the terms used. Indeed, the very purpose of this part of section 9 would seem to be to afford an employer security from penalty in his good-faith reading of and justifiable reliance on express administrative declarations and pronouncements. The report of the House Committee on the Judiciary, on the original bill, House Report No. 71, February 25, 1947, U.S. Cong. Serv., 80th Cong., 1st Sess., pp. 1029, 1036, speaks of the purpose "to protect the employer against the retroactive effect of changes in administrative regulations, etc." The statute uses more general and comprehensive terms in the part immediately following—"or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged" (which is not here involved) —but the difference only emphasizes the significance of the implied formalism of the preceding terms.

 As to section 11 of the Portal-to-Portal Act, however, the attack upon the trial court's ruling presents a more serious question. That section gives the court discretion to deny liquidated damages, in whole or in part, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."

The court's decision in the Administrator's injunction suit,[2] which was allowed to become final, that the candy kitchen was part of the employer's retail establishment and its employees were within the exemption of the establishment, clearly could have a significance under section 11 of the Portal-to-Portal Act, as "reasonable grounds for believing", which it did not possess per se in relation to the different question under section 9. As a matter of fact, the legal mind can hardly conceive of any more "reasonable grounds" for taking a particular course under a statute of unsettled construction than a judicial decision on the precise question, made in an action to which one has been an immediate party, which is relied on in good faith. And the Administrator's voluntary dismissal of his appeal also could have a possible confirmatory significance under section 11, though not possessing the qualities of a formalized interpretation as required on the question under section 9.

We have previously indicated that the trial court made a general finding, in relation to both sections 9 and 11, that the employer had in good 'faith relied on the decision in the injunction suit and the Administrator's dismissal of his appeal as a basis for its continued nonpayment of overtime compensation to the employees of the candy kitchen. The court did not, however, in its conclusions in relation to section 11 decide whether this constituted "reasonable grounds" on the part of the employer for believing that it was not violating the Fair Labor Standards Act. The only questions expressly resolved in the conclusions, in denying the employer relief under section 11 of the Portal-to-Portal Act, were (1) that there could not be said to be anything in Interpretative Bulletin No. 6, issued by the Administrator, which constituted "reasonable grounds" for the employer's failure to pay overtime compensation to the employees of the candy kitchen, and (2) that the opinion and advice of the employer's attorneys as to the inapplicability of the Fair Labor Standards Act would not constitute "reasonable grounds" for the employer's belief that it was not violating the Act. But, as what we have previously said suggests, the decision in the injunction suit, in its legal significance and as a basis for reliance, was not coterminous with these factors, and it was not therefore impliedly disposed of by the conclusions which the court made.

To enable the trial court to consider and decide the question specifically, and to permit it to exercise the discretion with which it is vested under section 11 of the Portal-to-Portal Act, if the situation is one which calls for relief, the judgment will be vacated and the cause remanded for further proceedings not inconsistent with this opinion.

---

[2] The decision was one by the late Judge Merrill E. Otis, who in his day was recognized as one of the outstanding jurists of the federal district bench.

Since the initial and underlying question on the appeal has been determined against appellant, and the costs incurred · have been primarily in relation to that question, no costs will be allowed appellant on the appeal.

Judgment vacated and cause remanded with directions.