FERRER et al. v. WATERMAN S. S. CORPORATION.

TORRES et al. v. WATERMAN S. S. CORPORATION.

ALGARIN et al. v. WATERMAN S. S. CORPORATION.

Civ. Nos. 3741, 4034, 4035.

United States District Court
D. Puerto Rico. San Juan Division.
May 9, 1949.

### General Cargo

| From | To | Work Days | Holidays |
|---|---|---|---|
| 7 a.m | 12 M.D. | $0.55 | $0.77 |
| 12 M.D. | 1 p.m. | 0.90 | 1.00 |
| 1 p.m. | 4 p.m. | 0.55 | 0.77 |
| 4 p.m. | 6 p.m. | 0.77 | 0.84 |
| 6 p.m. | 7 p.m. | 0.90 | 1.20 |
| 7 p.m. | 11 p.m. | 0.77 | 0.84 |
| 11 p.m. | 12 M.N. | 0.90 | 1.25 |
| 12 M.N. | 6 a.m. | 0.84 | 1.02 |
| 6 a.m. | 7 a.m. | 1.30 | 1.40 |

### Special Cargo

Cement, Fertilizer, Creosoted Lumber, Scrap Iron, Suchal, Calcium, Raw Sugar in San Juan and Mayaguez

| From | To | Ashore | Aboard | Ashore | Aboard |
|---|---|---|---|---|---|
| 7 a.m. | 12 M.D. | $0.60 | $0.66 | $0.88 | $0.93 |
| 12 M.D. | 1 p.m. | 1.00 | 1.10 | 1.10 | 1.30 |
| 1 p.m. | 4 p.m. | 0.60 | 0.66 | 0.88 | 0.93 |
| 4 p.m. | 6 p.m. | 0.80 | 0.85 | 1.02 | 1.03 |
| 6 p.m. | 7 p.m. | 1.10 | 1.30 | 1.65 | 1.90 |
| 7 p.m. | 11 p.m. | 0.80 | 0.85 | 1.02 | 1.03 |
| 11 p.m. | 12 M.N. | 1.10 | 1.30 | 1.65 | 1.90 |
| 12 M.N. | 6 a.m. | 1.02 | 1.08 | 1.08 | 1.08 |
| 6 a.m. | 7 a.m. | 1.25 | 1.50 | 1.45 | 1.70" |

Arturo Ortiz Toro, San Juan, Puerto Rico, for plaintiffs.

J. R. Beverley, San Juan, Puerto Rico, for third-party plaintiff.

C. R. Hartzell, United States Attorney, San Juan. Puerto Rico, for defendant.

CHAVEZ, District Judge.

Plaintiffs Guadalupe Barbosa Ferrer and others filed suit to recover unpaid overtime compensation, liquidated damages and attorneys fees under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Judgment for overtime compensation and liquidated damages was rendered for plaintiffs in the total sum of $36,958.88. Ferrer v. Waterman Steamship Corporation, D.C., 70 F.Supp. 1. Thereafter, pursuant to a ruling by this Court, 76 F.Supp. 601, the defendant set up two special defenses under Sections 9 and 11 of the Portal-to-Portal Act approved May 14, 1947, 29 U.S.C.A. 258, 260, and the only question before the Court is upon said two special defenses.

Plaintiffs were employed as longshoremen under yearly collective bargaining agreements between their union and the defendant company. The collective bargaining agreement provided for different rates of pay according to the hours worked and the cargo handled and such rates were paid by the company. The contract set up the following scale of compensation:

"The hours of work and the wages for working days, extraordinary hours and holidays, according to the cargo to be handled, shall be as follows:

In the original trial of this case and at the present time the defendant company and the intervenor take the position that rates after 4 p. m. and on Sundays and holidays, were true overtime rates and entitled to be considered as such in all calculations and that the regular rate of pay was from 7 a. m. to 12 noon and from 1 p. m. to 4 p. m., as set out in the collective bargaining agreement regardless of whether the rates were for general cargo or for special cargo. The defendant argues that a true example of the incentive pay was the difference in rates during regular hours between general cargo and special cargo and that night work and Sundays and holidays worked at extra rate were entitled to be counted as overtime pay.

The Court adopted the report of the Special Master who rejected the theory of the defendant and made his findings and calculations as to regular rate of pay by taking the total pay of each plaintiff each week and dividing it by the number of hours worked during said week. This regular rate was then used as the basis for the computation of time and a half after forty hours work per week.

Since the Court has already held that the varying rates of pay received by the plaintiffs under their contract were regular rates and not overtime and approved the Special Master's computation of the amounts due,

the question arises under the two special defenses whether the actions or omissions of the defendant were:

(a) In good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval or interpretation of any agency of the United States, or any administrative practice or enforcement policy of any such agency, or

(b) in good faith and "with reasonable grounds for believing" that it was not a violation of the Fair Labor Standards Act of 1938.

The statutes and sections of Interpretative Bulletin No. 4, pertinent to this care, are as follows:

Section 9, Title 29 U.S.C.A. § 258:

"In any action or proceeding commenced prior to or on or after May 14, 1947 based on any act or omission prior to May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith, in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect. May 14, 1947, c. 52, § 9, 61 Stat. 88."

Section 11, Title 29 U.S.C.A. § 260:

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title. May 14, 1947, c. 52 § 11, 61 Stat. 89."

Sections 13 and 14 of Interpretative Bulletin No. 4 as originally released (1938) and sections 69, 70 and 71 of Interpretative Bulletin No. 4 as amended (1940) and examples 3, 5, 6(a), 6(b) of Section 70, are as follows:

"Section 13—Extra Compensation for Overtime Not included in Determining Regular Rate of Pay.

"Extra compensation paid for overtime work need not be included in determining the employee's regular hourly rate of pay. Thus, if an employee earns $19.50 for a regular 39-hour workweek and time and a half or 75 cents is paid for all hours in excess of 39, the regular hourly rate of pay is still 50 cents an hour and, if the employee worked 46 hours one week he would be entitled to $24.75 (39 hours x 50 cents) plus (7 hours 75 cents) or (46 hours x 50 cents) plus (7 overtime hours x 25 cents). The same principle applies to a pieceworker or hourly rate employee where time and a half is given for overtime work."

"Sec. 14. Employees Paid at Two Rates of Pay in Single Workweek.

"If an employee, during a single workweek, is paid at two different rates of pay, his regular hourly rate of pay, on which time and one-half must be paid, is the average hourly rate for the week, computed by dividing the weekly earnings at both rates by the total number of hours worked in the week. For his overtime work the employee is entitled to a sum, in addition to such earnings, equivalent to one-half the hourly rate of pay, arrived at as indicated, multiplied by the number of hours worked in excess of 40. Thus, suppose an employee works 30 hours a week at an occupation paying 40 cents an hour, and 20 hours in the same week at an occupation paying 50

cents an hour. The employee's hourly rate of pay is 44 cents an hour—$22 (30 hours x 40 cents) plus (20 hours x 50 cents) divided by 50 hours) and he is entitled to be paid a total wage of $24.20 (30 hours x 40 cents) plus (20 hours x 50 cents) plus (10 overtime hours x 22 cents). In other words, the employee is entitled to be paid an amount equivalent to 44 cents an hour for 40 hours and 66 cents an hour for 10 hours. The regular hourly rate of pay will be computed in the same way where a pieceworker is employed at two different piece rates during the week or in any other case where an employee works at two different rates during a week."

Sec. 69 of Interpretative Bulletin:

"The question has been asked as to what are the requirements of Section 7 in cases where a union agreement or other agreement between an employer and his employees calls for the payment of overtime or other special compensation which is not required to be paid by the act. Extra compensation paid for overtime work, even if required to be paid by a union agreement or other agreement between the employer and his employees need not be included in determining the employee's regular hourly rate of pay (see par. 13 of this Bulletin.) Furthermore, in determining whether he has met the overtime requirements of section 7 the employer may properly consider as overtime compensation paid by him for the purpose of satisfying these requirements, only the extra amount of compensation—over and above straight time—paid by him as compensation for overtime work— that is, for hours worked outside the normal or regular working hours—regardless of whether he is required to pay such compensation by a union or other agreement. In no week, of course, will the overtime requirements of section 7 be met unless the employee receives an amount equal to at least his regular rate of pay for 40 hours and time and one-half such rate for the hours worked in excess of 40. It should be noted, however, that the act does not supersede provisions of a collective bargaining agreement or other agreement between an employer and his employees which set standards higher than those set in the act; which, for example, require the employer to pay time and a half for all hours worked in excess of 8 hours a day regardless of how many hours in the aggregate the employee may work in a week. Nothing in the act, therefore, relieves an employer from any obligation he may have assumed by contract (see Interpretative Bulletin No. 8, especially paragraphs 4 through 9 thereof.) It should be pointed out, however, that the question as to what are the obligations of the employer under the agreement is a question of general contract law about which it is not the function of the Division to express any opinion."

Section 70 (Examples)

"(3) An agreement of employment calls for the payment of time and one-half for all hours worked in excess of 8 hours, the normal or regular workday.

"Suppose an employee paid $1 an hour works the following schedule:

|                             | M   | T  | W  | T  | F | S | S |
|-----------------------------|-----|----|----|----|---|---|---|
| Hours                       | 10  | 10 | 10 | 10 | 8 | 0 | 0 |
| Pay under union agreement   | $11 | 11 | 11 | 11 | 8 | 0 | 0 |

"In our opinion the payment of $52 to which the employee is entitled under the union agreement, will satisfy the requirements of section 7. Since the extra $4 for the daily overtime is paid by the employer to the employee as overtime compensation the employer may properly consider and credit himself with such amount as overtime compensation paid to meet the requirements of section 7. When the extra $4 is so credited, the amount paid the employee $52—is an amount equal to the employee's regular rate of pay for 40 hours and time and one-half such rate for the extra 8 hours and the employer has satisfied the requirements of section 7. We reject the contention that the employer must pay $56 to satisfy the requirements of the act. (48 x $1) plus (8 daily overtime hours x 50¢) plus (8 weekly overtime hours x 50 cents). To do so would impose a double penalty upon the employer by requiring him to pay time and one-half for hours already paid for at time and one-half."

"(5) An agreement of employment calls for the payment of straight time up to 48 hours and double time thereafter.

"Suppose an employee paid $1 an hour works the following schedule:

| | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|
| Hours | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| Pay under union agreement | $8 | 8 | 8 | 8 | 8 | 8 | 16 |

"In our opinion the payment of $64 to which the employee is entitled under the union agreement will satisfy the requirements of section 7. Since the extra $8 for the 8 hours in excess of 48 is paid by the employer to the employee as overtime compensation the employer may properly consider and credit himself with such amount as overtime compensation paid to meet the requirements of section 7. When the extra $8 is so credited the amount paid the employee—$64—is an amount equal to the employee's regular rate of pay for 40 hours and time and one-half such rate for the extra 16 hours and the employer has satisfied the requirements of section 7. Of course, should the employee work only 48 hours one week he must be paid $52 (40 times $1 plus (8 x $1.50) for that week in spite of the provision in the union agreement that he is to receive the overtime rate only after 48 hours are worked in a week.

"(6) An agreement of employment calls for the payment of time and one-half for all hours worked on a holiday or on Sunday.

"(a) Suppose an employee paid $1 an hour works the following schedule:

| | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|
| Hours | 8 | 8 | 8 | 8 | 8 | 8 | 0 |
| Pay under union agreement | $8 | 12 | 8 | 8 | 8 | 8 | 0 |

"In our opinion the payment of $52 to which the employee is entitled under the union agreement will satisfy the requirements of section 7. We reject the contention that the employer must pay $56 to satisfy the requirements of the act (48 x $1) plus (8 holiday overtime hours x 50 cents) plus (8 weekly overtime hours x 50 cents). To do so would impose a double penalty upon the employer by requiring him to pay time and one-half for hours already paid for at time and one-half.

"(b) Suppose an employee paid $1 an hour works the following schedule:

| | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|
| Hours | 0 | 8 | 8 | 8 | 8 | 8 | 8 |
| Pay under union agreement | $0 | 8 | 8 | 8 | 8 | 8 | 12 |

"This case is no different from the preceding case, and in accordance with our opinion, the payment of $52 to which the employee is entitled under the union agreement will satisfy the requirements of section 7.

"It has been urged upon us that a time and one-half rate for work on Sunday and holidays is not an overtime rate at all but is merely a straight-time rate for such days. The straight-time rate is higher because work on Sundays and holidays is more onerous than work on ordinary work-days. If this suggestion were adopted the employee must be considered as being employed at two different rates during the week and his regular rate of pay and the overtime compensation due him would be computed in accordance with the interpretation set forth in paragraph 14 of the bulletin. However, it is our opinion that generally work on Sundays and holidays may properly be considered as overtime work and the interpretation set forth herein may be considered applicable.

"Section 71. The same principles expressed in the foregoing opinions would, likewise, apply where a State or Federal law calls for the payment of overtime or other special compensation which is not required by the Fair Labor Standards Act. They would also apply where an employer customarily pays overtime or other special compensation which is not required by the act."

### Defense under Section 9.

Section 9 of the Portal-to-Portal Act required by its specific terms that defendant plead and prove that the omission to pay plaintiffs according to the Fair Labor Standards Act was (1) in good faith (2) in conformity with and (3) in reliance upon (4) any administrative regulation, order, ruling, approval, or interpretation of any agency of the United States or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which defendant belonged, and thus placed the burden of proof specifically upon defendant, which it had to sustain with respect to each of the four foregoing requirements. Jackson v. Northwest Airlines, D.C., 76 F.Supp. 121; Burke v. Mesta Mach. Co., D.C., 79 F.Supp. 588, 611.

"The test of good faith is an objective one, and not the actual state of mind of the employer." " 'Good faith' cannot be established as a simple fact. It is an ultimate fact—a conclusion to be drawn from all the circumstances." Although in some instances it has been held to denote honesty of purpose, or the actual existing state of mind without regard to what it should be from given standards of law or reason, in other instances it has been defined as honesty of intention, and freedom from knowledge or circumstances which ought to put the defendant employer on inquiry. "The defense of 'good faith' is intended to apply only where an employer innocently and to his detriment followed the advice as it was laid down to him by governmental agencies without notice that such interpretations were claimed to be erroneous or invalid." Burke v. Mesta Mach. Co., supra; Colket v. St. Louis Union Trust Co., 8 Cir., 52 F.2d 390; In re Vater et al., D.C., 14 F.Supp. 631; Siano v. Helvering, D.C., 13 F.Supp. 776; Reid v. Day & Zimmerman, D.C., 73 F.Supp. 892; Jackson v. Northwest Airlines, D.C., 76 F.Supp. 121, 126; Gustafson v. Fred Wolferman, Inc., D.C., 73 F.Supp. 186, affirmed as to defense under Sec. 9, Fred Wolferman, Inc. v. Gustafson, 8 Cir., 169 F.2d 759. Interpretative Bulletin, Portal-to-Portal Act, 29 Code Regulations, Chapter 5, Part 790, Sec. 790.19, issued November 1947.

"In good faith." "Generally, as derived from equity, this phrase connotes a state of mind characterized by honesty of purpose, freedom from intention to be unfair, and the absence of known or readily discoverable facts which would lead to further inquiry." Kam Koon Wan v. E. E. Black, Ltd., D.C., 75 F.Supp. 553, 561.

"Mere proof that officials in Army Ordinance Department who were supervising operations of employer's war plant under a cost-plus-a-fixed-fee contract examined employer's payroll in which certain employee was listed as exempt executive did not establish an 'administrative approval', within Portal-to-Portal Act, so as to relieve employer from liability to such employee for overtime compensation under Fair Labor Standards Act." Day & Zimmermann v. Reid, 8 Cir., 168 F.2d 356.

In Glowienke v. Hawaiian Dredging Co., D.C.Ill.1948, 84 F.Supp. 678, it was held that acts of employer in asserted reliance on official approval of pay-roll classifications and on a Navy Department interpretation that cost-plus-fixed-fee contractors were not subject to the Fair Labor Standards Act did not constitute reliance in good faith so as to relieve employer of liability under Sec. 9 where, in spite of such rulings and interpretations by the naval officer in charge at the continental plants of defendant and of a ruling of the Bureau of Yards and Docks of the United States Navy, the employer had secured no ruling from the Wage and Hour Administrator as to the applicability of the Fair Labor Standards Act to employees at its continental plants, or its non-applicability, and also, there were rulings of the Wage and Hour Administrator as well as court decisions conflicting with the approval and interpretation given by the naval officer and the Bureau of Yards and Docks.

In Burke v. Mesta Mach. Co., supra, the court stated that it appeared to it that a company of such size would have had in its employ trained counsel or individuals qualified to consider labor relations policies, and to keep informed from day to day as to the various administrative rulings, interpretations, regulations, or policies which were promulgated and adopted by the Administrator of the Wage and Hour Division whose duty it was to administer the Fair Labor Standards Act. And it was emphasized that inquiry could have been made to the Administrator and/or the Secretary of Labor as to whether or not any policy, ruling, regulation, or interpretation had been issued which would govern or contain any information as to whether or not the particular employer was obligated to include an incentive bonus which he was paying in the computation of overtime payment to be made to his employees.

In Darr v. Mutual Life Insurance Company, 2 Cir., 169 F.2d 262, the Court held on supported evidence that it had been the administrative practice and enforcement poli-

cy of the Wage and Hour Division not to enforce the provisions of the Fair Labor Standards Act in the insurance business before December 6, 1940, the date upon which the employer voluntarily complied with such provisions; that enforcement of the statute in the insurance business was not attempted by such agency before February 10, 1942; that in failing to make payment for overtime worked—as distinguished from rest period time—for which plaintiffs sued, defendant, in addition to acting in good faith in the belief based upon reasonable grounds that the statute did not cover its employees, had also acted in conformity with and in reliance upon the above-mentioned administrative practice and enforcement policy of the Wage and Hour Division.

■ "Section 9 of the Portal-to-Portal Act is mandatory and much broader in scope than Section 11, which merely clothes the Court with discretionary control over the item of liquidated damages. Section 9 is a bar to the action if the employer actually pleads and proves that his omission was in good faith in conformity with and in reliance on any administrative regulations or ruling of any agency of the United States." Rogers Cartage Co. v. Reynolds, 6 Cir., 166 F.2d 317, 3 A.L.R.2d 1090, 1185.

In Bruescke v. Joshua Hendy Corp., D. C.,[1] 3 A.L.R.2d 1191, the court held that defendant had established its defense under section 9. In this case it appeared that plaintiffs had been employed as hull surveyors upon a monthly salary basis up to an early date in 1944; that on said date, defendant changed plaintiffs to an hourly wage basis, and from that date until their respective employment terminated, plaintiffs continued on an hourly wage rate basis that reduced their pay rate, but had received one and a half times their respective hourly wage rate for all hours worked over forty hours in any work week; that defendant was building ships for use in World War II by the United States on a cost-plus-fixed-fee contract with the United States Maritime Commission, an agency of the United States; that the changes in plaintiff's monthly salary to an hourly wage basis, as aforesaid, although resulting in an actual wage re-

duction, were not to circumvent the Fair Labor Standards Act but that defendant had made this rate reduction in good faith and for the purpose of maintaining a balanced wage and salary level at its shipyard; that defendant pleaded, and also proved, that the National War Labor Board, Shipbuilding Commission, rendered a formal written ruling (after defendant's application to said Commission) authorizing defendant to change plaintiff's method of pay to the hourly wage rates of pay that defendant paid after the date specified, that this ruling was rendered and had been delivered to defendant some weeks earlier, that subsequent to receipt thereof by defendant it received the approval of the United States Maritime Commission to effect the pay conversion, as aforesaid, as to plaintiffs, and that defendant thereafter and in good-faith reliance upon the said ruling of the National War Labor Board, Shipbuilding Commission, and the approval of the United States Maritime Commission, had effected and changed plaintiffs to the hourly wage rates as approved by said agencies of the United States.

In Wells v. Radio Corp. of America, D.C., 77 F.Supp. 964, 967, the Court held that proof of its good faith was overwhelming, not a scintilla of credible evidence was adduced to the contrary, and the involved and lengthy evidence revealed no single suspicious circumstance or other proof of an attempt to deprive an employee of his just compensation by use of an inaccurate and high-sounding title for a purely routine or manual job. Hence the company had acted in good faith, even though it may have been mistaken in classifying the employees as exempt on the ground that they were bona fide executive or administrative employees. In this case investigators of the Wage and Hour Division of the Department of Labor made inspections to determine whether the employees were being and had been properly paid and to check the classification of employees as exempt or not exempt. The result of this investigation was that certain recommendations were made relative to amounts found for one reason or another to be due to various employees. The company made these payments. No such rec-

ommendation was made concerning any of these plaintiffs. The Court then said: "As a practical matter the Company executives may well have regarded this investigation and its result as more or less giving the plant a clean bill of health. There is, however, no proof of any 'regulation, order, ruling, approval or interpretation,' within the meaning of Section 9 of the Portal-to-Portal Act of 1947."

"The words 'administrative regulation, order, ruling, approval, or interpretation' must be read in the light of the familiar principle of ejusdem generis. It would not be contended that an inspector of the Wage and Hour Division could issue an administrative regulation; in all administrative agencies, that is a function of the head of the agency. On the same principle, I think that an employer, to come within the protection of an administrative approval or interpretation, must have followed the familiar routine of submitting a particular problem to the head of the agency for a ruling or opinion. An opinion letter of the head of the agency or his counsel, ruling on the question, interpreting the section of the statute in question in the light of the facts of the employer's situation, or approving the employer's interpretation of the law, would come within the meaning of this section. I think nothing less will do. Likewise, the action of a few inspectors does not establish an administrative practice or enforcement policy." Bauler v. Pressed Steel Car Co., D.C.N.D. Ill., 81 F.Supp. 172, 176; Fred Wolferman Inc. v. Gustafson, 8 Cir., 169 F.2d 759; Burke v. Mesta Mach. Co., supra; Central Missouri Tel. Co. v. Gonwell, 8 Cir., 170 F.2d 641; Welles v. Radio Corp., D.C., 77 F.Supp. 964; Semeria v. Gatto, Sup., 75 N.Y.S.2d 140; Reid v. Day & Zimmerman, D.C. Iowa 1947, 73 F.Supp. 892, affirmed, Day & Zimmermann v. Reid, 8 Cir., 168 F.2d 356.

See also International Longshoremen's Association v. National Terminal Corp. D.C., 50 F.Supp. 26, affirmed in Cabunac v. National Terminal Corp., 7 Cir., 139 F.2d 853.

"The definition of overtime premium thus becomes crucial in determining the regular rate of pay. We need not pause to differentiate the situations that have been described by the word 'overtime.' Sometimes it is used to denote work after regular hours, sometimes work after hours fixed by contract at less than the statutory maximum hours and sometimes hours outside of a specified clock pattern without regard to whether previous work has been done, e. g., work on Sundays or holidays. It is not a word of art. See Premium Pay Provisions in Selected Union Agreements, Monthly Labor Review, U. S. Department of Labor, October 1947, Vol. 65, No. 4. Overtime premium has been used in this opinion as defined in note 3.* It is that extra pay for work because of previous work for a specified number of hours in the workweek or workday. It is extra pay of that kind which we think that Congress intended should be excluded from computation of regular pay. Otherwise the purpose of the statute to require payment to an employee for excess hours is expanded extravagantly by computing regular rate of pay upon a payment already made for the same purpose for which § 7(a) requires extra pay, to wit, extra pay because of excess working hours. Accordingly, statutory excess compensation paid for work in excess of forty hours should not be used to figure the regular rate. Neither should similar contract excess compensation for work because of prior work be used in such a calculation. Extra pay by contract because of longer hours than the standard fixed by the contract for the day or week has the same purpose as statutory excess compensation and must likewise be excluded. Under the definition, a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium. It is immaterial in determining the character of the extra pay that an employee actually has worked at a lower rate earlier in the workweek prior to the receipt of the higher rate. The higher rate must be paid because of the hours previously worked for the extra pay to be an overtime premium." *Note: "Overtime Premium.—extra pay for work because of previous work for a specified number of hours in the workweek or workday whether the hours are specified

by contract or statute." Bay Ridge Operating Co. v. Aaron et al., 334 U.S. 446, 465, 68 S.Ct. 1186, 1197, 92 L.Ed. 1502.

### Defense under Section 11.

"The 'good faith' required to entitle an employer to avail himself of the provisions of Section 11 has reference to something different from the good faith of employers in actually believing that an employee was exempt from the provisions of the Fair Labor Standards Act." Burke v. Mesta Mach. Co., supra; Reid v. Day and Zimmerman, D.C., 73 F.Supp. 892, affirmed, Day & Zimmermann v. Reid, 8 Cir., 1948, 168 F.2d 356. Note 3 A.L.R.2d 1205.

■ The mere fact that a defendant erred in applying the facts under the law does not deprive it of the relief offered by Section 11, since that section by its very nature and existence contemplates relief to employers who erred in determining their wage and hour liabilities. A defendant may have been acting in good faith where its theory was not entirely unreasonable and that will be regarded as shown by the fact that a Governmental agency had adopted defendant's conclusion, even though rather hesitatingly and rejecting some of its premises and officials of the agency and officers of the Air Corps with whom the defendant was dealing had similarly indicated their opinion. Because defendant's approach to the question may have been unsound as a matter of law does not make the ground it relied upon unreasonable. Jackson v. Northwest Airlines, D.C., 76 F.Supp. 121.

■ A "good faith" defense need not rely on a regulation or order issued by the Wage and Hour Administrator or the Secretary of Labor, for, in order to come within the provisions of Section 11, it can be based on any administrative action of any one of scores of governmental agencies and one way of showing that there were "reasonable grounds" for belief in the lawfulness of a certain action would be for an employer to prove that his conduct was influenced by some authoritative administrative or judicial ruling in a similar situation. Burke v. Mesta Mach. Co., supra.

### Facts

Defendant's former general manager testified that he worked for defendant company from 1934 to 1941 and participated in the formation of the collective bargaining agreements; that the payment practices under the agreements were established before the Fair Labor Standards Act was passed and that after the Act became effective they followed the same pattern and the same or practically the same scale of wages; that the steamship committee had been in existence many years before the passage of the Fair Labor Standards Act and that the collective bargaining agreement of defendant with the workers was practically the same as the collective bargaining agreement of the other shipping companies. He also testified that Mr. Prudencio Rivera Martinez obviously participated in all such negotiations, as at the time of the negotiation of the collective bargaining agreements, he (Rivera Martinez), was Commissioner of Labor of the Insular Government and checked all contracts. This witness does not remember ever writing or consulting with the Wage and Hour Division or the Regional Attorney as to whether they were complying with the law.

The evidence discloses that the defendant consulted and obtained the opinion of counsel as to each collective bargaining agreement and that these agreements were negotiated jointly with the other shipping companies; that the defendant consulted his attorney as to the contract and the Interpretative Bulletin No. 4 and received the opinion that the higher rates provided in the collective bargaining agreement for extraordinary hours were overtime which could be properly credited against the statutory extra compensation due under Sec. 7 of the Fair Labor Standards Act. It also appears that the other companies consulted their attorneys and the defendant and the other shipping companies consulted each other and all received the same opinion. The defendant relied upon his counsel's opinion and relied upon Bulletin No. 4 after studying it and believed that payments made under the contract complied with the statute. The evidence further dis-

closes that the shipping companies including the defendant had a committee of head officials that met frequently to discuss their common problems, questions of policy and exchanged information regarding opinions and advice of their respective attorneys and questions of the application of the Act to the collective bargaining agreements.

Mr. Rivera Martinez, the President of the committee on claims or stevedores, testified that in 1943 the Administrator of the Department of Labor, Wage and Hour Division, Mr. Walling was in Puerto Rico and that he consulted him with reference to the collective bargaining agreements and asked Mr. Walling whether the agreements were in conformity with the law and that Mr. Walling advised him that the agreements were not in conformity with the law.

Ramon Rodriguez Sanchez, a certified public accountant, testified that he had been employed by the Bull Insular Line since 1920 and handled questions of wages and hours for the company and intervened in the stevedoring contracts; that the contracts for stevedoring are uniform in San Juan, all shipping companies following the same policy with regard to the payment of stevedores and paid in conformity with the collective bargaining agreement; that the company consulted counsel as to the application of the Fair Labor Standards Act to these contracts and obtained an opinion from their attorneys that they were complying with the Act; that the Bull Insular Line and defendant were represented on the steamship committee wherein common labor problems were discussed and that the committee after obtaining the opinion of counsel and exchanging views and studying the Bulletin were of the opinion that the payment of overtime in accordance with the agreement was in compliance with the law; that the interpretation placed on Bulletin No. 4 by the steamship committee was that any overtime compensation paid to an employee was credited to the employee in the computation of time worked. The witness further testified that the steamship committee came to this conclusion and to their interpretation of Bulletin No. 4 about the time that the Wage and Hour law went into effect and prior to the time that they received the opinion from their attorneys. In short, that the opinion of the attorneys was given in 1943 and that way back in 1938 they had come to the conclusion that the agreements covered the requirements of the law.

This witness testified that inspectors from the Wage and Hour Division investigated their payrolls and although the inspectors requested that restitution be made as to certain employees such as checkers, foremen and motormen, the company was never requested to make any restitution for any back pay due to stevedores. This witness, however, testified that the matter of investigations by Wage and Hour Inspectors was never discussed with the steamship committee. That sometime subsequent to the inspection, the company discussed with the Wage and Hour Administrator the matter of the restitution to stevedores and that the same were left pending since a complaint had been filed in Court and the matter was awaiting the court's decision. This witness also testified that the pay practice and policy of the shipping companies were the same prior to and after the enactment of the Fair Labor Standards Act. This witness testified that he did not remember receiving letter dated June 22, 1943 from Mr. Russell Sturgis and he was never told by the Wage and Hour Division that their company was complying with the Fair Labor Standards Act and that after his company received the opinion from their attorneys, they never inquired further. (Restitution was made in the case of checkers, foremen and motormen.) This witness further testified that he agreed with the opinion of Mr. Herrick that the higher rate of pay under the collective bargaining agreement for handling cargo of a special matter was incentive pay and not a wage and that he considered it incentive pay in the sense that it affects their health, that is, when they handle cargo such as fertilizer, lumber and similar cargo.

Defendant's present manager testified that he came to Puerto Rico in September 1942 and participated in negotiations for the 1943 collective bargaining agreement and that when the War Shipping Administration took over steamship operations in 1942, defendant operated as agents of the War Shipping Administration and all docu-

ments were thereafter signed "War Shipping Administration, per Waterman Steamship Co., Agents." The standard form of so-called "War Ship. Stev." for stevedoring operations was extended to cover Puerto Rico by letter of the War Shipping Administrator and the contract provided that all wages paid for stevedoring were subject to the approval of the War Shipping Administration. Copies of the collective bargaining agreement were sent to the home office of the defendant in New York and forwarded from there to the War Shipping Administration in Washington which received them without comment. Thereafter, wage bills for stevedoring operations and copies of payrolls covering stevedoring were regularly submitted to the War Shipping Administration and approved for payment and audited by the examiners. No question was ever raised as to the wage scales upon which the bills were paid, unless there was an error of calculation. Defendant never discussed methods of payment or differentials with the War Shipping Administration representative and never wrote the War Shipping Administration for its views or inquired of the territorial representative, asking an opinion as to whether the wage payments under the collective bargaining agreements satisfied the provisions of the Act. Neither did the defendant ask officials of the Wage & Hour Division or any other Federal agency about this particular matter. The evidence further discloses that inspectors of the Wage & Hour Division investigated defendant's payrolls including payment to stevedores during January and February 1943. Defendant's present manager testified that he came to the conclusion that the company was complying with the law partly on advice of counsel and on the fact that the other steamship companies, acting in concert signed the same kind of contract. The evidence further discloses that the defendant and the other steamship companies never formally consulted either the Administrator of the Wage and Hour Division or his territorial representative or his counsel about the matter of whether they were complying with the Act and no advice was ever given by the Administrator or his territorial representative that the pay prac-

tices of defendant complied or conformed with the law.

The parties stipulated that letter dated 22 June 1943, should be admitted in evidence with the following understanding: that said letter was prepared by the Wage and Hour Division in Puerto Rico to be sent to all the steamship companies in Puerto Rico; that in the ordinary course of office routine it was supposed to be sent to the steamship companies; that it actually was sent to and received by the Lykes Steamship Company but that the witness, Mr. Sturgis, cannot swear it was actually sent to all the other companies since the only company that acknowledged receipt was the Lykes Steamship Company. The parties stipulated that Mr. Thyvaert, the Manager of the Waterman Line and Mr. Naranjo, the second man in the company, have no recollection of ever having seen such a letter and that a search of their files reveals no such letter. Copy of said letter is as follows:

"To All Steamship Companies;

"We have received the following memorandum from the Administrator regarding method of computing overtime paid for longshoremen in Puerto Rico:

"I understand that these employees are working under an agreement which provides that the rates of pay shall be 55 cents an hour for work performed between 7:00 a. m. and 4:00 p. m., 77 cents an hour for work performed between 4:00 p. m. and 11:00 p. m., and 87 cents an hour for work performed between midnight and 6:00 a. m., with special rates for meal hours, Sunday, holidays and handling of certain kinds of cargo.

"It is my opinion that the rates above 55 cents an hour are not overtime rates but higher rates which are paid for working undesirable hours, or performing more undesirable work, and that they, in reality, are regular rates for the work performed."

Russell Sturgis
Territorial Representative

Under the special defense under Section 9, the defendant relies upon two propositions:

1. the acceptance by the War Shipping Administration of stevedoring bills of de-

fendant company without comment and the auditing of the payrolls of the defendant company and the fact that investigations were made by the Wage and Hour inspectors, and

2. defendant's reliance upon Interpretative Bulletin No. 4.

■ As to the first propostion the Court holds that under the authorities the fact that investigators of the Wage and Hour Division made inspections and ordered certain restitutions and that the War Shipping Administration audited the payrolls of the defendant company, did not constitute an administrative regulation, order, ruling, approval or interpretation of an agency of the United States or any administrative practice or enforcement policy of any such agency.

As to the second proposition the defendant relies upon Sections 13, 69, 70 and 71 of Interpretative Bulletin No. 4.

Interpretative Bulletin #4 originally issued contained paragraph 13 and was not changed in the 1940 amendment. Paragraphs 69, 70 and 71 were added by amendment of the Bulletin in July 1940.

Paragraph 13 provides that "extra compensation paid for overtime worked need not be included in determining the employees' regular hourly rate of pay."

Paragraph 14 provides that "if an employee, during a single workweek, is paid at two different rates of pay, his regular hourly rate of pay, on which time and one-half must be paid, is the average hourly rate for the week, computed by dividing the weekly earnings at both rates by the total number of hours worked in the week. For his overtime work the employee is entitled to a sum, in addition to such earnings, equivalent to one-half the hourly rate of pay, arrived at as indicated multiplied by the number of hours worked in excess of 40."

The Court in this case has held, however, that the higher rates of pay for hours classified as "extraordinary" hours in the collective bargaining agreement were regular rates and not overtime. Ferrer v. Waterman Steamship Corporation, D.C., 70 F. Supp. 1.

The Court adopted the following findings: that plaintiffs received the pay described in the agreements as pay for extraordinary hours if they worked any such hours regardless of whether they worked the regular hours or not; that plaintiffs worked any hours of day or night Sundays or holidays if work at such times was requested by the Company and that work of plaintiffs followed no particular pattern, there being many weeks in which they did not work and in the weeks they worked the hours worked for most of plaintiffs varied greatly; and that it was the desire of the shipping companies to utilize the services of stevedores during the so-called regular hours if possible but if business expediency demanded it they were worked the so-called extraordinary hours even though it was necessary to pay the stevedores a higher rate.

Also the Supreme Court of the United States has held in the Bay Ridge case that overtime premium [336 U.S. 446, 68 S.Ct. 1197] "is that extra pay for work because of previous work for a specified number of hours in the workweek or workday." Thus the "overtime" referred to in paragraph 13 of the Bulletin is the "overtime premium" as defined by the Supreme Court, or what may be termed as "true overtime," or bona fide overtime compensation.

Section 69 of the Bulletin refers to overtime compensation, as only the extra amount of compensation—over and above straight time—paid as compensation for overtime worked—that is, for hours worked outside the normal or regular working hours. Section 69 refers also to "true overtime."

Subsections 1, 2 and 3 of paragraph 70 of the Bulletin illustrate that the overtime payments under a union agreement may be credited against overtime due under the Act, only where paid for hours over a fixed number previously worked.

Subsection (6) of paragraph 70 of the Bulletin provides "an agreement of employment calls for the payment of time and one half for all hours worked on a holiday or on Sunday."

In this case, however, the Court after setting out the scale of wages under the contract ruled as follows:

"A study of the above table shows that it bears no relation to hours in excess of forty

in any given week. It will also be observed that the hours for which the higher rate is paid are hours when most men would prefer to be eating lunch, or dinner, or at home asleep—in other words, disagreeable hours. These hours are compensated for at a higher rate in the same manner that "special" cargo is compensated for at a higher rate than "general" cargo. Holidays—of which a long list is included in the contracts,—also are compensated for at a higher rate. Different rates in connection with "special" cargo are provided for work ashore and aboard. No one, I daresay, would contend that the extra or increased compensation for workers with "special" cargo could be considered as overtime."

Counsel for the defendants calls the Court's attention to letter dated June 30, 1948, issued by the U. S. Department of Labor, Wage and Hour Division, entitled "Statement of Wage-Hour Administrator on Effect of Decision in Longshoremen's Case." The pertinent paragraphs are as follows:

"Employers who have in the past paid time and one-half compensation for work because it was performed on Saturdays, Sundays, or holidays, or at hours actually "outside the normal or regular working hours" and have treated the extra pay as an overtime premium in good faith reliance on the interpretations of the Wage and Hour Division are in most cases protected by the Portal-to-Portal Act from any resulting back-wage liabilities, it was announced by Mr. Wm. R. McComb, Administrator of the Wage and Hour and Public Contracts Division, U. S. Department of Labor, in a statement of his views on the effects of the Supreme Court decision handed down in Bay Ridge Operating Co. v. Aaron and Huron Stevedoring Co. v. Blue.

"Mr. McComb added, however, that under the Supreme Court decision, employers could no longer follow the Administrator's Interpretations (expressed in paragraphs 69 and 70 of Interpretative Bulletin No. 4 and elsewhere) when extra payments are made because of the undesirable hours when the work is performed rather than because the hours are in excess of a specified standard. For the future, therefore, some employers will have to make neces-

sary adjustments in their overtime pay practices in order to come within the scope of the Supreme Court opinion. The opinions expressed in paragraphs 69 and 70 of Interpretative Bulletin No. 4 are now withdrawn, Mr. McComb emphasized insofar as they relate to extra payments of the kinds above described."

As heretofore stated in this opinion paragraphs 69 and 70 of Interpretative Bulletin No. 4 have reference to situations in which "true overtime" or "overtime premiums" are paid. That is "overtime premiums" as defined in the Bay Ridge case. They do not concern with situations where premium compensation is paid as a shift differential, or because of disagreeable hours. If the Bay Ridge case expresses any disagreement with the Administrator of the Wage and Hour Division it could only be as to situations relating solely to extra compensation for work on Saturdays, Sundays or holidays, Interpretative Bulletin No. 4 did provide that premium payments made for work performed on Saturday, Sunday and holidays were presumed to be overtime payments and would be so considered by the Administrator. This was on the theory that work on such days should be considered as "compensation for overtime work, that is, for hours worked outside the normal or regular working hours." Therefore, there may be some merit in the belief that treatment as overtime of premium payments on Saturday, Sunday and holidays might have been made in good faith reliance upon the Administrator's position prior to the Bay Ridge case. However, the Bay Ridge case was not in disagreement with the Administrator in situations where premium compensation was paid as a shift differential. Thus the withdrawal of Section 69 and 70 from the Bulletin did not and could not apply to compensation for shift differential such as occurred in this case where stevedores were paid different rates of pay for working such hours as from 7:00 p. m. to 11:00 p. m. or from 11:00 p. m. to 12 M.N. or from 12:00 p. m. to 6:00 a. m.

The Administrator in Paragraphs 69 and 70 of Interpretative Bulletin No. 4 did not treat all premium compensation as overtime compensation, because as was

shown in this case the Administrator specifically stated that the collective bargaining agreement between the stevedores and the shipping companies in Puerto Rico did not in his opinion comply with the Fair Labor Standards Act. If it seems that the Bulletin was not altogether clear, the court may give the Administrator's interpretation controlling weight unless it is plainly erroneous or inconsistent with the regulation. Bowles v. Seminole Bridge Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700.

Defendant argues, however, that the June 22, 1943, letter is of little importance since even if sent out and received, it only antedated the filing of these suits by two or three months, and, therefore, it could not affect, in any event, any claims arising prior to June 1943. The record in these consolidated cases shows that the complaint in cause No. 3741 C. was filed on September 27, 1943. Causes Nos. 4034 C. and 4035 C. were filed on June 28, 1944. The periods covered by the complaint are as follows: for cause No. 3741 C. from September 27, 1940 to September 27, 1943; for causes Nos. 4034 C. and 4035 C. from May 15, 1941 to May 15, 1944.

Going now to the argument that the evidence discloses that the defendant relied in good faith upon an administrative regulation, order, etc., under Section 9 prior to June 22, 1943.

Upon the question of "good faith" under Section 9 it must be remembered that defendant negotiated the same kind of collective bargaining agreements before the Fair Labor Standards Act was passed and continued the same kind of contracts after the Act was passed. After the Fair Labor Standards Act became effective, Interpretative Bulletin No. 4 was issued. Therefore, if the defendant relied upon Interpretative Bulletin No. 4 in 1938 and in good faith believed that he was complying with the Act, from 1938 to 1940 the defendant relied exclusively upon section 13 of the Bulletin as sections 69, 70 and 71, were not included in the Bulletin until 1940.

The next question is when did the defendant consult counsel and obtain his opinion that the collective bargaining agreements conformed to the Fair Labor Standards Act. Defendant's former manager (1934–1941) Mr. Lugo Vina is indefinite on this point. He states generally that he consulted his attorney and considered the application of the Fair Labor Standards Act to the stevedores contracts. Although this witness testified when asked a general question that during the time he represented the defendant in Puerto Rico he believed in good faith and relied on Interpretative Bulletin No. 4, and on advice of counsel that payments under the contract complied with Section 7 of the Act, when asked specifically as to when he consulted counsel after October 24, 1938 replied: "I cannot remember the day. It would be impossible. Simply because I do not remember when there was a written opinion or not." Later Mr. Lugo Vina testified that he read Interpretative Bulletin No. 4 when it came out and consulted his attorney in this first instance, but he cannot remember when he spoke to his attorney about this Bulletin whether it had examples of different rates.

Upon this point defendant's present manager who came to defendant company in September 1942, testified that he took part in the negotiations of the 1943 collective bargaining agreement and became connected with the steamship committee. Upon becoming manager he looked into the stevedores' contracts, consulted his attorney, read parts of Bulletin No. 4, relied on counsel and relied on the Bulletin and believed that the payments were in proper form. This witness further testified that although his attorney's opinion was not in writing, his impression that the collective bargaining agreement for 1943 complied with the law was based partly on advice of his attorney and partly on the fact that the other steamship companies acted in concert signing the same kind of an agreement. This witness when asked specifically as to whether he acted partly on his own judgment, replied: "I did not have any judgment in the matter. I was not aware of the law in Puerto Rico and could not use my own judgment."

Two other witnesses, representatives of two other shipping companies, testified as to when they consulted counsel. These witnesses are Ramon Rodriguez Sanchez, Auditor of the Bull Insular Line and G. Santa O'Neill, Certified Public Accountant of the N. Y. and P. R. Steamship Company.

Ramon Rodriguez Sanchez testified that he was employed by the Bull Insular Line for 28 years and was a member of the steamship committee and read Bulletin No. 4. He testified further that his opinion and the steamship committee's opinion after consulting counsel was that the contracts complied with the Fair Labor Standards Act. He states, however, that his company obtained counsel's opinion in 1943, "and way back in 1938 we reached the conclusion that our agreements covered the requirements of the law."

G. Santa O'Neill, auditor for the N. Y. and P. R. Steamship Company testified that he had been with his company for 24 years, his company consulted counsel about two months before the Act went into effect and his company's opinion after consulting their attorney was that they were complying with the law.

In this case the question is when did the defendant consult his attorney and obtain an opinion that the collective bargaining agreements complied with the law and not when did the Bull Insular Line and the N. Y. & P. R. Steamship Company consult counsel. The theory upon which the testimony as to the acts and doings of other steamship companies was admitted, was that the steamship companies acted in concert. However, as to when each company consulted counsel, that is a different matter as the companies consulted counsel at different times. Even so the witness for the Bull Insular Line says that he, and the steamship company committee, of which defendant was a member, came to the conclusion way back in 1938 that the collective bargaining agreements complied with the act, whereas the Bull Insular Line did not consult counsel until 1943.

Thus between 1938 and 1940 the steamship companies relied exclusively on Section 13 of the Bulletin and the evidence clearly shows that the steamship companies came to the conclusion that they were complying with the Act at the time the Act was passed in 1938.

In 1940 paragraphs 69, 70 and 71 were added to Interpretative Bulletin No. 4, therefore, from 1940 to June 22, 1943 the defendant undoubtedly relied upon sections 13, 69, 70 and 71 of the Bulletin.

There is a very serious doubt in the Court's mind as to whether Interpretative Bulletin No. 4 clearly and unmistakenly support the construction placed upon them by the defendant to the effect that Interpretative Bulletin No. 4 sustained and approved the pay practice of the defendant under the collective bargaining agreement. It is more reasonable to believe that the various provisions of the Bulletin and the factual situation with which the defendant was confronted and which facts were not clearly and completely identical with the examples set out under Paragraph 70 of the Bulletin, were sufficient to put the defendant upon further inquiry.

The evidence discloses (a) that collective bargaining agreements were negotiated between plaintiffs and defendants both before and after the Fair Labor Standards Act was passed and that the contracts followed the same general pattern;

(b) that the defendant secured no ruling from the Wage and Hour Administrator or his territorial representative as to whether the pay practices or rates under the collective bargaining agreement complied with the Fair Labor Standards Act;

(c) that defendant and the other steamship companies in Puerto Rico consulted and advised regularly with each other on questions of policies, common problems, attorneys opinions, etc.

(d) that the defendant relied upon Interpretative Bulletin No. 4 and the opinion of their attorneys and other steamship company attorneys and came to the conclusion in 1938 that the collective bargaining agreement complied with the Fair Labor Standards Act.

(e) that in 1943 the Director of the Wage and Hour Division, Department of Labor, Mr. Walling, was in Puerto Rico and advised the President of the Committee on Claims for the stevedores, that the collective bargaining agreement between plaintiffs and the defendant company were not in conformity with the law, thus disclosing the position of the Administrator;

(f) that on June 22, 1943 the Wage and Hour Division in Puerto Rico prepared a letter to be sent to all the steamship companies in Puerto Rico; that in the ordinary course of office routine it was supposed to be sent to all the steamship companies; that it was actually sent to and received by the Lykes Line in San Juan but that the district representative, Mr. Sturgis, cannot swear that it was actually sent to all the other companies since the only company that acknowledged receipt was the Lykes Line.

Under the evidence the Court finds that the defendant did have knowledge of the June 22, 1943 letter. Defendant says that they have searched their files and cannot locate it. However, the evidence is so strong that the shipping companies consulted and advised with each other on all common problems that it is impossible for the Court to say that the Lykes Line did not communicate the contents of the June 22, 1943 letter, particularly when it contained a ruling of such importance and which affected all the steamship companies in Puerto Rico.

■ This brings us face to face with Sections 13, 69 and 70 of Interpretative Bulletin No. 4 upon which defendant relies. The question arises: do paragraphs 13, 69 and 70 of the Bulletin clearly show on their face that they approve the pay practices under the collective bargaining agreement?

Section 13 of the Bulletin standing alone does not clearly show this. Besides as heretofore pointed out this section has reference to "overtime premiums" or "true overtime" as defined by the Supreme Court of the United States. As to sections 69 and 70 I cannot see how they can be construed to say that they clearly and unmistakenly approve the pay practices of the defendant under the agreements, except possibly as to Saturdays, Sundays and holidays.

■ It also argued that the defendant consulted his attorneys and the other shipping companies consulted their attorneys and that they advised that the collective bargaining agreement complied with the Act. How much weight should the Court give to the testimony on this particular point as a defense under Section 9? Certainly it cannot give it the same weight as it would give similar evidence under a defense under Section 11. It seems to the Court that under Section 9 the testimony that an employer obtained counsel's opinion can only be considered in a limited sense. This is so because the gist of the defense under Section 9 is "good faith in conformity with and in reliance on any administrative regulation, order ruling, approval or administrative interpretation of any agency of the United States or any administrative practice or enforcement policy of any such agency with respect to the class of employer to which he belonged."

■ We now come to the question of whether or not the defendant has shown to the satisfaction of the Court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that such act or omission was not a violation of the Fair Labor Standards Act. The evidence discloses: (a) that the collective bargaining agreements were negotiated both before and after the Fair Labor Standards Act was passed and that they followed the same general pattern, thus indicating that the contracts were not drawn up with the express purpose of circumventing the provisions of the act; (b) that the defendant relied upon the provisions of Interpretative Bulletin No. 4 and the opinion of his attorney and the opinion of the other steamship companies' attorneys to the effect that the collective bargaining agreement complied with the Fair Labor Standards Act and although the Court has ruled that the construction placed upon Bulletin No. 4 by the defendant was unsound, nevertheless, it does not make the ground it relied upon reasonable; (c) that the defendant obtained the opinion of counsel as to each collective bargaining agreement and that these agreements were negotiated jointly with the other steamship companies in Puerto Rico; (d) that the defendant relied to a certain extent upon the fact that the Union themselves had submitted the contract and agreed to its terms.

The Court cannot escape the belief under the evidence, that defendant's actions were influenced to some extent by Interpretative

Bulletin No. 4 and the opinion of his attorney. And although the opinion of an attorney of itself may not be sufficient to constitute a defense, nevertheless it may bear upon the reasonableness of defendant's attitude. The divided opinion in the Bay Ridge case is evidence that the opinion of defendant's attorney and upon which defendant relied was not an unreasonable one.

Therefore, the Court is of the opinion that the defendant had reasonable grounds to believe that it was complying with the Fair Labor Standards Act and that good faith existed under Section 11 up to the 22nd day of June, 1943, but not thereafter. Therefore, exercising its discretion the Court will hold that no liquidated damages be awarded in this case, for the period prior to June 22, 1943.

Let a proper judgment be entered in conformity with this opinion.